## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

LISA MARINO,

          Plaintiff,

          v.

LIFE INSURANCE COMPANY OF NORTH AMERICA,

          Defendant.

Civil Action No.

**VERIFIED COMPLAINT**

Plaintiff, Lisa Marino ("Marino" or "Plaintiff"), claims of the Defendant Life Insurance Company of North America, a subsidiary of Cigna Insurance Group ("Cigna"), and says:

## GENERAL ALLEGATIONS

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this action pursuant to the Employee Retirement Income Security Act ("ERISA") § 502(e)(1), (f) and 28 U.S.C. § 1331.

2.     Personal jurisdiction exists over Cigna because the alleged breaches occurred in this judicial district, and Cigna may be found in this judicial district pursuant to ERISA § 502(e)(2).

3.     Personal jurisdiction is also proper over Cigna pursuant to Fed. R. Civ. P. 4(e)(1), (e)(2)(C).

4.     Venue in this Court is proper because the alleged breaches occurred in this judicial district, and Cigna may be found in this judicial district pursuant to ERISA § 502(e)(2).  Venue is proper under 28 U.S.C. § 1391(b).

5.     Venue is also proper in the District of New Jersey because Marino is a citizen of New Jersey and resides in this judicial district.

## PARTIES

6.      Marino is a citizen of the State of New Jersey with her residence at 182 Oakwood Avenue, West Long Branch, New Jersey.

7.      Upon information and belief, Cigna is a Delaware Corporation with a principal place of business in the State of Connecticut, doing business in the State of New Jersey as an admitted insurer, authorized to transact business as a disability, life, accident, and health insurer.

## SPECIFIC ALLEGATIONS

8.      Marino, who is permanently disabled due to the removal of a left acoustic neuroma[1] in 2006, and its resulting sequalae, brings this action against Cigna seeking to recover benefits from an employee welfare benefit plan pursuant to ERISA, 29 U.S.C. § 1001 *et seq*., and other applicable law and to recover additional damages for its systematic bad faith in denying disability claims of Plaintiff and other disabled insureds under its disability policies.

9.      On or about January 1, 2004, Long Term Disability group policy number FLK-980008 (the "Policy") was issued by Life Insurance Company of North America[2] for the benefit of the Saint Barnabas Health Care System ("Saint Barnabas") employees.  A true and accurate copy of the Policy is attached as **Exhibit "A"**.  The Policy is an employee benefit plan under ERISA.

10.     At the time the Policy was issued, Marino was employed as a billing supervisor in Saint Barnabas, and she was within Class 1 of eligible employees covered under the Policy. *See*

---

[1] An Acoustic Neuroma is a tumor found in the area of the brain where the auditory (hearing) nerve enters the bony opening of the skull between the brain and the inner ear. The tumor arises in the vestibular nerve, which is involved in balance, and therefore the proper name is a vestibular schwannoma. *See* http://neurosurgery.ucla.edu/acoustic-neuroma (last visited on January 26, 2016).

[2] According to Cigna's website, Cigna's "[l]ife (other than GUL), accident, critical illness, and disability plans are insured or administered by Life Insurance Company of North America." *See* http://www.cigna.com/ (last visited on January 26, 2016).

*id.* at 1.

11.     In September 2006, due to Marino's left acoustic neuroma diagnosis, she underwent resection surgery to remove the tumor, which was located near the main nerve leading from her inner ear to her brain.  The surgery left Marino without hearing in her left ear, tinnitus, severe headaches associated with nausea, vomiting, visual disturbances, vertigo and episodes of syncope.

12.     Following the resection surgery and as a result of it, Marino also suffered from chronic dizziness and/or vertigo, lightheadedness, and other vestibular symptoms such as issues with sensory information about motion, equilibrium, and spatial orientation.

13.     Due to these symptoms, Marino found it increasingly difficult to function in her work environment at Saint Barnabas because of the excessive and constant visual and auditory stimuli.

14.     It was then recommended that Marino take a three month leave of absence from her employment in 2007 to rest and continue treatment to alleviate the migraine headaches, vertigo, and other symptoms.

15.     Following her leave of absence, Marino attempted to return to work on several occasions; however, in late 2008, her symptoms and side effects from the medications (which included, among other things, sensory loss in her arms and visual disturbances with periodic vision loss) caused her to take another three month leave of absence from Saint Barnabas.

16.     Marino remained determined to continue her employment against the medical advice from her neurologist, and her work environment was tailored to reduce noise and visual disturbances.

17.     Despite these accommodations, Marino's headaches, tinnitus, vertigo and other symptoms persisted and had an adverse effect on her physical health.  Due to Marino's debilitating

3

symptoms and her inability to perform the material duties of her occupation, her treating neurologist, Noah R. Gilson, M.D., diagnosed her as permanently disabled and was resolute that she must cease employment.

18.     Additionally, David Falco, M.D., Marino's internist, agreed with Dr. Gilson's assessment that Marino was permanently disabled and must cease employment.

19.     On March 13, 2009, based on her physicians' directions, Marino ceased her employment with Saint Barnabas.

20.     Because Marino was permanently disabled and could no longer work, she filed for benefits under the Policy.  At all times relevant hereto, the Policy contained the following definition of "Disabled:"

> The employee is considered Disabled if, solely because of Injury[3] or Sickness,[4] he or she is:
>
> 1.  unable to perform the material duties of his or her Regular Occupation; and
> 2.  unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.
>
> After Disability Benefits have been payable for 24 months, the Employee is considered disabled if, solely because of Injury or Sickness, he or she is:
>
> 1.  unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
> 2.  unable to earn 60% or more of his or her Indexed Earnings.

*See id.* at 4.

21.     Cigna determined that Marino met the Policy's definition of Disabled, and benefits

---

[3] The Policy defines Injury as "[a]ny accidental loss or bodily harm which results directly and independently of all other causes from an Accident." *See* **Exhibit "A"** at 39.

[4] The Policy defines Sickness as "[a]ny physical or mental illness." *See id.* at 40.

were approved in the amount of approximately $1,842 per month with a benefit start date of September 10, 2009.

22.     After Marino was approved for benefits under the Policy, Cigna representatives retained Advantage 2000 Consultants, a firm that specializes in Social Security Disability ("SSD") representation, to assist Marino in overturning a claim for SSD that had initially been denied by the Social Security Administration ("SSA"), but which, if approved, would reduce the amount of benefits Cigna would pay to Marino.[5]

23.     At the time the forms were completed for SSD, it was represented to SSD by Advantage 2000 Consultants — who was both retained and provided information by Cigna — that Marino was permanently disabled within the meaning of the Social Security statute and that her condition would not likely improve.

24.     Marino was subsequently approved for SSD and received a SSD benefit of approximately $984 per month, which effectively reduced the benefit that Cigna paid to Marino.

25.     Since the time Marino was approved for benefits under the Policy and for SSD, Marino's health condition and permanent disability has remained unchanged. In fact, the Cigna claims file contains numerous notations that Marino has an "ongoing functional loss," the "condition is not likely to improve," and that Marino's "condition has not changed." Marino's treating physicians have confirmed that she remains permanently disabled.

26.     Despite Cigna's understanding that Marino remained permanently disabled, and without any evidence demonstrating that her condition had improved, on June 3, 2015, Cigna began to research "full sedentary occupations" that may be suitable for Marino.

---

[5] Under the Policy, "the monthly benefit payable is the Gross Disability Benefit less Other Income Benefits . . . ." *See id.* at 5. SSD is a type of "Other Income Benefit[]", and therefore Marino's Gross Disability Benefit payable by Cigna would be reduced by any SSD benefit she received. *See id.* at 28.

27.     Based on Cigna's own self-serving research, and without consideration of the fact that Plaintiff remained disabled under the Policy and continued to receive SSD benefits which were only payable if Plaintiff was disabled, it identified several sedentary occupations that it claimed would be appropriate in the fields of clerical, insurance, and medical support industries, including Marino's own occupation as a billing supervisor in the medical field, the very occupation in which Cigna had recognized for the past six years that Marino was unable to perform her material duties.

28.     On June 29, 2015, Marino received a correspondence from Cigna indicating that Cigna is unable to consider Marino disabled beyond June 25, 2015, and that benefits would be paid through July 25, 2015, and then cease immediately thereafter based on Cigna's determination that Marino was capable of returning to work (the "Wrongful Denial Letter"). A true and accurate copy of the Wrongful Denial Letter is attached as **Exhibit "B"** at 3.

29.     The letter was devoid of any new medical information that would support a change in the conditions or status of Marino or any evidence of improved health. *See id.* Cigna's decision to deny benefits nearly six years after it was determined that Plaintiff was Disabled was based nearly entirely on a fabricated finding that Marino could now perform sedentary occupations, notwithstanding the fact that the occupations identified in Cigna's research were available in 2009, at the time of the original determination of Disability, when a finding was made that Marino was incapable of performing these same occupations.

30.     The only new information upon which Cigna now decided to wrongfully deny Plaintiff benefits were: (a) a May 28, 2015 Disability Questionnaire form completed by Plaintiff; (b) medical records of Dr. Gilson and Dr. Falco including an intentionally ambiguous Physical

Abilities Assessment form completed by Dr. Falco on June 6, 2015. None of this information in any way showed that Plaintiff was no longer Disabled under the Policy.

31.     In the May 28, 2015 Disability Questionnaire form, Plaintiff indicated that she remained Disabled with the primary physical symptoms being vertigo, passing out, migraines with partial loss of sight, dizziness with a feeling of falling forward, balance issues, ringing in her ears, confusion and vomiting. This form confirmed Plaintiff's continuing disability and provided no basis for determining Plaintiff was no longer Disabled.

32.     The medical records provided by both Dr. Falco and Dr. Gilson showed no improvement of Plaintiff's condition which would allow her to work. To the contrary, the records showed that Plaintiff remained disabled and that her symptoms have worsened rather than improved. The medical records provided no basis for now determining Plaintiff was no longer disabled.

33.     The Physical Ability Assessment form that Cigna requested Dr. Falco to complete was knowingly and purposely ambiguous and did not provide him with the full opportunity to adequately explain the physical limitations of Plaintiff's disability and how they impacted her life.

34.     After being advised that Cigna, in the Wrongful Denial Letter, relied upon the ambiguous June 3, 2015 Physical Ability Assessment form as the basis for denying Plaintiff's benefits, Dr. Falco prepared a letter dated July 7, 2015, a true and accurate copy of which is attached as **Exhibit "C."** In the letter Dr. Falco advised that:

- Plaintiff has been in his care since the removal of the left acoustic neuroma in 2006;
- Since her surgery she has had no improvement in her post-operative symptoms which include headaches, dizziness, tinnitus in the left ear, vertigo, disruption of balance, syncope and visual disturbances;

7

- As a result of these symptoms Plaintiff cannot drive on a road greater than two lanes and for more than a mile;

- Plaintiff struggles in a busy environment as she is unable to process sound directions leading her to become disoriented, which disorientation has led to full-blown panic and anxiety episodes.

*See id.*

35.     Notably, in the July 7, 2015 letter Dr. Falco stated, "In the physical ability assessment form provided by you [sic] her insurance company, I was unable to adequately express the physical limitations Mrs. Marino's disability plays in her every day life." *See id.*

36.     Dr. Falco remained of the opinion that Plaintiff continued to be disabled and concluded that, "I do not foresee her as being able to assimilate into any work environment." *See id.*

37.     In the Wrongful Denial Letter, Cigna relied upon the medical records of Dr. Gilson and, in denying Plaintiff further benefits, stated that the records did not show any recent visits with Dr. Gilson since July of 2014. *See* **Exhibit "B"**.

38.     In response to the Wrongful Denial Letter, Dr. Gilson prepared a letter dated July 8, 2015, a true and accurate copy of which is attached as **Exhibit "D"**.  In the letter Dr. Gilson explained that:

- Plaintiff remains permanently disabled;

- The impressions that Plaintiff was permanently disabled and unable to work, as initially set forth in his letter of May 7, 2010, have remained unchanged from that time;

- Plaintiff has remained clinically unchanged since that date;

8

- Plaintiff returns for yearly follow ups which is more than adequate frequency to determine her ongoing permanent disability status.

*See id.*

39.     In the Wrongful Denial Letter, Cigna acknowledged that Plaintiff was awarded SSD in September 2009 and that this fact was ostensibly considered in the claim review.  *See* **Exhibit "B"**.  However, it failed to either review or request any documents regarding Plaintiff's SSD and failed to explain why Plaintiff was no longer disabled when the federal government has recognized her permanent disability for over six years. *See id.*  Cigna further failed to explain how it has used the SSD paid to Plaintiff over the past six years as a set off against the disability benefits paid under the Policy, which is predicated on Plaintiff being permanently disabled, when it now maintains Plaintiff is not disabled. *See id.*  As a result, Cigna is estopped from denying Plaintiff continues to be disabled.

40.     It should be noted that in 2013, Cigna entered into a Regulatory Settlement Agreement (the "RSA") with various states arising from Cigna's improper claims handling practices related to its disability income insurance policies.  A true and accurate copy of the Regulatory Settlement Agreement is attached as **Exhibit "E"**.

41.     Following an investigation of whether Cigna's claims handling practices conformed to the standards reflected in the National Association of Insurance Commissioners ("NAIC"), and in light of regulatory concerns raised during the investigation, Cigna agreed to the plan of corrective action set forth in the RSA, which included the establishment of a remediation program for the redetermination of certain long-term disability claims and the payment of certain fines. *See id.*

42.     Cigna specifically agreed to implement a plan of corrective action, which included, but is not limited to the following steps:  (i) enhanced claim procedures (including procedures regarding the weight to be given to awards of SSD benefits, enhanced procedures regarding the gathering of medical information and the documentation of conclusions, guidelines for use of external medical resources); (ii) additional training of claims personnel; (iii) implementing a remediation program; (iv) monitoring compliance with the RSA; (v) forming a quality assessment team; and (iv) quarterly monitoring. *See id.*

43.     Cigna's inexplicable and abrupt decision to terminate Marino's benefits after six years and make a finding devoid of any medical basis that she was capable of returning to work as explained in the Wrongful Denial Letter is wholly consistent with Cigna's improper claims practices for which it was disciplined in the RSA.

44.     As a result, after receiving the Wrongful Denial Letter on July 8, 2015, counsel for Marino at the time, sent a letter to Cigna as a formal demand for an appeal of Marino's denial of benefits.  Marino's counsel enclosed the medical reports by Dr. Gilson and Dr. Falco, which demonstrated that Marino remained permanently disabled.

45.     Additionally, the Policy provides the following:

The Employee's ability to work is based on the following:

1.  medical evidence submitted by the Employee;
2.  consultation with the Employee's Physician; and
3.  evaluation of the Employee's ability to work by not more than three Independent Experts if required by the Insurance Company.

*See* **Exhibit "A"** at 4.

46.     Contrary to the terms of the Policy, Marino's ability to work was never evaluated by any independent experts in order for Cigna to make the determination that she can now resume

employment. Moreover, any medical evidence cited by Cigna was carefully selected in support of the denial based primarily on its purposely ambiguous Physical Ability Assessment form, which was later repudiated by Dr. Falco, while the overwhelming evidence — that Marino's physicians continue to diagnose her as permanently disabled and unable to work, and that she remains permanently disabled under the SSD laws — was completely ignored.

47.     Following the formal demand for an appeal, Marino's counsel provided supplemental medical reports and updated medical records to Cigna from her treating physicians, all of which indicated that Marino remained permanently disabled and unable to work for all of the same reasons that led to the original determination that she was permanently disabled (*i.e.* the permanent and debilitating effects of the left acoustic neuroma resection).

48.     Notwithstanding the formal appeal and supplemental information in support of Marino's claim for continued benefits, on October 20, 2015, Cigna sent a letter that indicated that the result of the appeal review is that Cigna must "uphold [its] previous decision to deny the claim for ongoing benefits" (the "Second Wrongful Denial Letter). A true and accurate copy of the correspondence dated October 20, 2015 is attached as **Exhibit "F"**.

49.     Notably, the Second Wrongful Denial Letter states that the Marino "had a primary diagnosis of multiple sclerosis with associated symptoms." *See id.* at 2. Marino has never been diagnosed and/or treated for multiple sclerosis, and it is clearly in error that Cigna considered a multiple sclerosis diagnosis as part of a basis to deny Marino's appeal.

50.     In the Second Wrongful Denial Letter, Cigna continued to rely on the knowingly ambiguous Physical Ability Assessment form completed by Dr. Falco, even though Dr. Falco explained that the form was inadequate to express the physical limitations Mrs. Marino's disability plays in her everyday life. *See* **Exhibit "C."** In the letter Cigna completely ignored Dr. Falco's

July 7, 2015 letter, failed to even reference it, and wrongfully concluded that Plaintiff could perform certain occupations, including as a billing supervisor, even though Dr. Falco expressly stated that he did not foresee her ability to assimilate into any work environment and despite the fact that Plaintiff had tried on multiple occasions to return to this occupation but was physically unable to do so. *See id.*

51.     In the Second Wrongful Denial Letter, Cigna acknowledged that Dr. Gilson concluded in his July 8, 2015 letter that Plaintiff was permanently disabled yet arbitrarily, capriciously and unreasonably, with no medical foundation, rejected this opinion, falsely asserting that Dr. Gilson's records do not "indicate in the records why [Plaintiff] is disabled."

52.     To the contrary, in his July 8, 2015 letter Dr. Gilson specifically referred to his May 7, 2010 letter that stated the impressions and recommendations in that letter remain unchanged. A true and accurate copy of the copy of the May 7, 2010 letter is attached as **Exhibit "G."**

53.     Despite being referred to Dr. Gilson's May 7, 2010 letter, which had previously been provided to Cigna and which set forth the basis for his conclusion as to why Plaintiff was disabled, in the Second Wrongful Denial Letter Cigna ignored the May 7, 2010 letter, failed to refer to it and instead falsely asserted that Dr. Gilson did not indicate why Plaintiff was disabled. *See* **Exhibit "F"**.

54.     In the May 7, 2010 letter, Dr. Gilson set forth his impressions, which have remained unchanged to this date, as follows:

> This is a woman status post removal of a left acoustic neuroma with sacrificing the left vestibular cochlear nerve. <u>This has resulted in permanent disability</u> because of chronic vestibular symptoms which then resulted in recurring headaches.

*See* **Exhibit "G."**

55.     In the May 7, 2010 letter, Dr. Gilson set forth his recommendations, which remain unchanged to this date, as follows:

> She is to remain on permanent disability.  I will manage the headaches as they come up.  Follow up will be in 6 months.  Level of medical decision was moderate taking into consideration the following factors:
>
> - Illness with severe exacerbation:  she's never really gotten better.
> - Significant risk of morbidity:  Significant.  The patient has been in constant agony.
> - Significant neurological illness:  Significant.
> - Possibility of significant prolonged functional impairment: She's currently disabled.

*See id.*

56.     In its Second Wrongful Denial Letter, Cigna recognized that Plaintiff has limitations or restrictions, but contrary to the medical records provided by Dr. Gilson and Dr. Falco, the very records which supported Plaintiff's disability for six years, Cigna now falsely stated that "an explanation of her functionality and how her functional capacity prevents her from performing any occupation from July 26, 2015 and forward is not medically supported." *See* **Exhibit "F"**.

57.     In the Second Wrongful Denial Letter, Cigna also stated that it was aware that Marino had been receiving SSD benefits through SSA, a fact which was allegedly considered by Cigna in its review. *See id.* However, without even requesting Marino's SSA file, Cigna concluded that SSA's criteria for benefits may be different than Cigna's, and there was no new information in the SSA file that should be factored into its decision to terminate Marino's benefits. *See id.*

58.     Cigna again failed to address how it has used the SSD benefits paid to Marino over the past six years as a set off against the disability benefits paid under the Policy, which is

predicated on Plaintiff being permanently disabled, when it now maintains Plaintiff is not disabled.

*See id.*

59.     Notwithstanding Cigna's baseless determination to terminate Marino's benefits, she continues to satisfy the definition of Disabled under the Policy after receiving benefits payable for 24 months, and she thus remains benefit eligible under the Policy.

60.     Cigna's denial of benefits to Marino and its flawed appeal review of the denial is in clear violation of the provisions of the Policy, demonstrates Cigna's reckless indifference and improper claims handling practices, and its manifest bad faith to its insured, and has caused and will continue to cause damages to Marino.

61.     Marino has further exhausted her administrative remedies as required by ERISA.

## COUNT I: CLAIM FOR BENEFITS — ERISA § 502(a)(1)(B)

62.     Marino repeats and realleges the allegations set forth in the General Allegations and Specific Allegations as though fully set forth at this point.

63.     ERISA § 502(a)(1)(B) provides that "[a] civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

64.     Marino is entitled to benefits under the Policy.

65.     Cigna has failed to review Marino's claim in a full and fair manner in violation of 29 U.S.C. § 1133 and C.F.R. § 2560.503-1.

66.     Cigna denied benefits to which Marino is entitled under the Policy in violation of 29 U.S.C. § 1132(a)(1)(B) and ERISA § 502(a)(1)(B).

67.     The decision to deny benefits was incorrect, arbitrary and capricious, and not supported by substantial evidence.

**WHEREFORE**, Plaintiff demands judgment against the Defendant:

A.     For a judicial determination to recover benefits under the Policy;

B.     To enforce her rights under the Policy and to clarify her rights to future benefits under the Policy;

C.     For prejudgment interest pursuant to ERISA § 502(a)(3);

D.     For costs, and attorney's fees pursuant to ERISA § 502(g), and the standards set forth in *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242 (2010); and

E.     For such other and further relief as the Court may deem appropriate.

## COUNT II:  ATTORNEY'S FEES — ERISA § 502(g)

68.     Marino repeats and realleges the allegations set forth in the General Allegations and Specific Allegations, and the First Count of the Complaint as though fully set forth at this point.

69.     ERISA § 502(g)(1) provides that "[i]n any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."

70.     Moreover, the Supreme Court in *Hardt v. Reliance Std. Life Ins. Co.*, held that under 29 U.S.C.S. § 1132(g), a litigant is (1) not required to be "prevailing party" to be eligible for attorney's fees award; and (2) entitled to award of fees and costs as long as litigant achieved some degree of success on merits. *See* 560 U.S. 242 (2010).

71.     Marino is entitled to her attorney's fees and costs arising from this litigation.

**WHEREFORE**, Plaintiff demands judgment against the Defendant:

A.      For attorney's fees and costs of suit; and

B.      For such other and further relief as the Court may deem appropriate.


GIORDANO, HALLERAN & CIESLA, P.C.
Attorneys for Plaintiff, *Lisa Marino*


By: /s/ Michael J. Canning
    MICHAEL J. CANNING

DATED:  March 3, 2016

16

## VERIFICATION

I, **LISA MARINO,** hereby states:

(1)     I am the Plaintiff in the foregoing Verified Complaint;

(2)     The allegations of the Verified Complaint are true to the best of my knowledge, information and belief;

(3)     Said Complaint is made in truth and in good faith and without collusion for the causes set forth therein.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by us are willfully false, I am subject to punishment.

LISA MARINO

Dated:  March 1, 2016

Docs #2190526-v2

17



LIFE INSURANCE COMPANY OF NORTH AMERICA
1601 CHESTNUT STREET                                    GROUP POLICY
PHILADELPHIA, PA 19192-2235
(800) 732-1603        TDD (800) 552-5744
**A STOCK INSURANCE COMPANY**

**POLICYHOLDER:**           TRUSTEE OF THE GROUP INSURANCE
                            TRUST FOR EMPLOYERS IN THE
                            SERVICES INDUSTRY

**SUBSCRIBER:**             Saint Barnabas Health Care System

PITTSBURGH

MAR 0 6 2008

**Group Life & Disability Coverage Unit**

**POLICY NUMBER:**         FLK-980008

**POLICY EFFECTIVE DATE:**  January 1, 2004

**POLICY ANNIVERSARY DATE:**  January 1

This Policy describes the terms and conditions of coverage. It is issued in Delaware and shall be
governed by its laws. The Policy goes into effect on the Policy Effective Date, 12:01 a.m. at the
Policyholder's address.

In return for the required premium, the Insurance Company and the Policyholder have agreed to all the
terms of this Policy.

*Susan L. Cooper*

Susan L. Cooper, Secretary

*Gregory H. Wolf*

Gregory H. Wolf, President

TL-004700                                                          O/O v-2

## TABLE OF CONTENTS

SCHEDULE OF BENEFITS.................................................................................................. 1

SCHEDULE OF BENEFITS FOR CLASS 1....................................................................... 4

SCHEDULE OF BENEFITS FOR CLASS 2....................................................................... 8

SCHEDULE OF BENEFITS FOR CLASS 3....................................................................... 11

SCHEDULE OF BENEFITS FOR CLASS 4....................................................................... 14

SCHEDULE OF BENEFITS FOR CLASS 5....................................................................... 18

SCHEDULE OF BENEFITS FOR CLASS 6....................................................................... 21

ELIGIBILITY FOR INSURANCE ..................................................................................... 24

EFFECTIVE DATE OF INSURANCE................................................................................ 24

TERMINATION OF INSURANCE...................................................................................... 24

CONTINUATION OF INSURANCE ................................................................................... 25

DESCRIPTION OF BENEFITS........................................................................................... 27

EXCLUSIONS...................................................................................................................... 34

CLAIM PROVISIONS ........................................................................................................ 34

ADMINISTRATIVE PROVISIONS ................................................................................... 36

GENERAL PROVISIONS ................................................................................................... 37

DEFINITIONS...................................................................................................................... 38

SCHEDULE OF AFFILIATES ........................................................................................... 41

## SCHEDULE OF BENEFITS

**Premium Due Date**

Premiums are due in arrears on the date coinciding with the day of the Policy Anniversary Date or the last day of the month, if earlier.

**Classes of Eligible Employees**

On the pages following the definition of eligible employees there is a Schedule of Benefits for each Class of Eligible Employees listed below. For an explanation of these benefits, please see the Description of Benefits provision.

If an Employee is eligible under one Class of Eligible Employees and later becomes eligible under a different Class of Eligible Employees, changes in his or her insurance due to the class change will be effective on the first of the month following the change in class.

Class 1      All active, Full-time Employees regularly working the required minimum hours as established by the Employer, excluding New Jersey Nurses Union (NJNU) Employees, Residents and Employees classified as Executives.

| Facilities under Class 1 | Minimum Hours per Week |
|---|---|
| Assisted Living | 35 |
| Center for Hospice Care | 37.5 |
| Center State Management Corp | 35 |
| Central New Jersey Behavioral Center | 35 |
| Clara Maas Medical Center | 35 |
| Clara Maas Continuing Care-Kearny | 35 |
| Clara Maas Continuing Care-Belleville | 35 |
| Clara Maas Continuing Care-West Hudson | 35 |
| Community Medical Associates | 35 |
| Community Medical Center | 36 |
| Country Manor | 40 |
| EMTAC | 32 |
| Irvington General Hospital | 32 |
| KareMed | 35 |
| Kensington Manor | 40 |
| Kimball Medical Center | 35 |
| Livingston Services Corporation | 37.5 |
| Major Investigations | 35 |
| The Marathon Group | 35 |
| MegaCare Nursing Homes-Ashbrook | 32 |
| MegaCare Nursing Homes-Cornell Hall | 32 |
| MegaCare Nursing Homes-Greenbrook | 32 |
| MegaCare Nursing Homes-Llanfair | 32 |
| Monmouth Faculty Practice | 35 |
| Monmouth Health Foundation | 35 |
| Monmouth Medical Center | 35 |
| Newark Beth Israel | 35 |
| Physicians Practice Service | 35 |
| SB Facilities Management | 37.5 |
| Saint Barnabas Medical Center | 37.5 |
| SB Development Foundation | 37.5 |

| | |
|---|---|
| SB Outpatient Centers | 37.5 |
| SBC Management Corporation | 35 |
| Saint Barnabas Behavioral Health | 35 |
| System Business Office | 35 |
| Union Hospital | 35 |
| Monmouth Health Management | 35 |

Class 2    All active, Full-time New Jersey Nurses Union (NJNU) Employees regularly working the negotiated minimum hours as established by the union.

Class 3    All active, Full-time and Part-time Employees classified as Executives regularly working the required minimum hours as established by the Employer.

| Facilities under Class 3 | Minimum Hours per Week |
|---|---|
| Assisted Living | 35 |
| Center for Hospice Care | 37.5 |
| Center State Management Corp | 35 |
| Central New Jersey Behavioral Center | 35 |
| Clara Maas Medical Center | 35 |
| Clara Maas Continuing Care-Kearney | 35 |
| Clara Maas Continuing Care-Belleville | 35 |
| Clara Maas Continuing Care-West Hudson | 35 |
| Community Medical Associates | 35 |
| Community Medical Center | 36 |
| Country Manor | 40 |
| EMTAC | 32 |
| Irvington General Hospital | 32 |
| KareMed | 35 |
| Kensington Manor | 40 |
| Kimball Medical Center | 35 |
| Livingston Services Corporation | 37.5 |
| Major Investigations | 35 |
| The Marathon Group | 35 |
| Medical Center Staffing Services | 35 |
| MegaCare Nursing Homes-Ashbrook | 32 |
| MegaCare Nursing Homes-Cornell Hall | 32 |
| MegaCare Nursing Homes-Greenbrook | 32 |
| MegaCare Nursing Homes-Llanfair | 32 |
| Monmouth Faculty Practice | 35 |
| Monmouth Health Foundation | 35 |
| Monmouth Medical Center | 35 |
| Newark Beth Israel | 35 |
| Physicians Practice Service | 35 |
| SB Facilities Management | 37.5 |
| Saint Barnabas Medical Center | 37.5 |
| SB Development Foundation | 37.5 |
| SB Outpatient Centers | 37.5 |
| SBC Management Corporation | 35 |
| Saint Barnabas Behavioral Health | 35 |
| System Business Office | 35 |
| Union Hospital | 35 |
| Monmouth Health Management | 35 |

Class 4      Grandfathered part-time Employees who were covered as of June 30, 1997.

Class 5      Grandfathered Resident Employees on file with the Employer.

Class 6      All named Employees on severance as on file with the Employer and the Insurance
             Company.

## SCHEDULE OF BENEFITS FOR CLASS 1

**Eligibility Waiting Period**

| | |
|---|---|
| For Employees hired on or before the Policy Effective Date: | 1st of the month following or coincident with 3 months from date of hire. |
| For Employees hired after the Policy Effective Date: | 1st of the month following or coincident with 3 months from date of hire. |

**Definition of Disability/Disabled**

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
1. unable to perform the material duties of his or her Regular Occupation; and
2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.

After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:
1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
2. unable to earn 60% or more of his or her Indexed Earnings.

The Insurance Company will require proof of earnings and continued Disability.

**Definition of Optimum Ability**
1. for the first 24 months that benefits are payable, the greatest extent of work the Employee is able to do in his or her Regular Occupation;
2. after 24 months, the greatest extent of work the Employee is able to do in any occupation based on education, training or experience.

The Employee's ability to work is based on the following:
1. medical evidence submitted by the Employee;
2. consultation with the Employee's Physician; and
3. evaluation of the Employee's ability to work by not more than three Independent Experts if required by the Insurance Company.

There is no cost to the Employee for evaluation by an Independent Expert when required by the Insurance Company to determine Optimum Ability.

The Independent Expert must be:
1. licensed, registered or certified as required by the laws of the state in which the evaluation is made; and
2. acting within the scope of that license, registration or certificate.

**Definition of Covered Earnings**

Covered Earnings means an Employee's wage or salary as reported by the Employer for work performed for the Employer as in effect just prior to the date Disability begins. Covered Earnings are determined initially on the date an Employee applies for coverage. A change in the amount of Covered Earnings is effective on the date of change, if the Employer gives us written notice of the change and the required premium is paid.

4

It includes shift differentials, but not amounts received as bonus, commissions, overtime pay or other extra compensation.

Any increase in an Employee's Covered Earnings will not be effective during a period of continuous Disability.

**Elimination Period**
|  |  |
|---|---|
| Core Plan | 180 days |
| Optional Plan | 180 days |

**Gross Disability Benefit**

Core Plan

The lesser of 60% of an Employee's monthly Covered Earnings rounded to the nearest dollar or the Maximum Disability Benefit.

Optional Plan

The lesser of 60% of an Employee's monthly Covered Earnings rounded to the nearest dollar or the Maximum Disability Benefit.

**Maximum Disability Benefit**
|  |  |
|---|---|
| Core Plan | $5,000 per month |
| Optional Plan | $5,000 per month |

**Minimum Disability Benefit**

Core Plan

The greater of $100 or 10% of an Employee's Monthly Benefit prior to any reductions for Other Income Benefits.

Optional Plan

The greater of $100 or 10% of an Employee's Monthly Benefit prior to any reductions for Other Income Benefits.

**Disability Benefit Calculation**
The Disability Benefit payable to the Employee is figured using the Gross Disability Benefit, Other Income Benefits, calculation of Optimum Ability and the Return to Work Incentive. Monthly Benefits are based on a 30-day month. The Disability Benefit will be prorated if payable for any period less than a month.

During any month the Employee has no Disability Earnings, the monthly benefit payable is the Gross Disability Benefit less Other Income Benefits, and less the calculation for Optimum Ability. During any month the Employee has Disability Earnings, benefits are determined under the Return to Work Incentive. Benefits will not be less than the minimum benefit shown in the Schedule of Benefits except as provided under the section Minimum Benefit.

"Other Income Benefits" means any benefits listed in the Other Income Benefits provision that an Employee receives on his or her own behalf.

*Return to Work Incentive*
During any month the Employee has Disability Earnings, his or her benefits will be calculated as follows.

The Employee's monthly benefit payable will be calculated as follows during the first 24 months disability benefits are payable and the Employee has Disability Earnings:

1. Add the Employee's Gross Disability Benefit and Disability Earnings.
2. Compare the sum from 1. to the Employee's Indexed Earnings.
3. If the sum from 1. exceeds 100% of the Employee's Indexed Earnings, then subtract the Indexed Earnings from the sum in 1.

4.   The Employee's Gross Disability Benefit will be reduced by the difference from 3., as well as by Other Income Benefits and the calculation for Optimum Ability.

5.   If the sum from 1. does not exceed 100% of the Employee's Indexed Earnings, the Employee's Gross Disability Benefit will be reduced by Other Income Benefits and the calculation for Optimum Ability.

After disability benefits are payable for 24 months, the monthly benefit payable is the Gross Disability Benefit reduced by Other Income Benefits, the calculation for Optimum Ability and 50% of Disability Earnings.

No Disability Benefits will be paid, and insurance will end if the Insurance Company determines the Employee is able to work under a modified work arrangement and he or she refuses to do so without Good Cause.

*Calculation for Optimum Ability*
The calculation for Optimum Ability is the earnings the Employee could earn if working at Optimum Ability, minus Disability Earnings.

## Additional Benefits

*Cost Of Living Adjustment (COLA) Benefit*
This Benefit does not apply to this class of Employee.

*Survivor Benefit*

| | |
|---|---|
| Amount of Benefit: | 100% of the sum of the last full Disability Benefit plus the amount of any Disability Earnings by which the benefit had been reduced for that month. |
| Maximum Benefit Period | A single lump sum payment equal to 3 monthly Survivor Benefits. |

## Maximum Benefit Period
Core Plan

| Age When Disability Begins | Maximum Benefit Period |
|---|---|
| Age 65 or under | The date the 24th Monthly Benefit is payable. |
| Age 66 | The date the 21st Monthly Benefit is payable. |
| Age 67 | The date the 18th Monthly Benefit is payable. |
| Age 68 | The date the 15th Monthly Benefit is payable. |
| Age 69 and over | The date the 12th Monthly Benefit is payable. |

Optional Plan

| Age When Disability Begins | Maximum Benefit Period |
|---|---|
| Age 61 or under | The Employee's 65th birthday. |
| Age 62 | The date the 42nd Monthly Benefit is payable. |
| Age 63 | The date the 36th Monthly Benefit is payable. |
| Age 64 | The date the 30th Monthly Benefit is payable. |
| Age 65 | The date the 30th Monthly Benefit is payable. |
| Age 66 | The date the 27th Monthly Benefit is payable. |
| Age 67 | The date the 24th Monthly Benefit is payable. |
| Age 68 | The date the 21st Monthly Benefit is payable. |
| Age 69 and over | The date the 18th Monthly Benefit is payable. |

**Initial Premium Rates**

Core Plan                          $.274 per $100 of Covered Payroll

Optional Plan

| Age | Rate per $100 of Covered Payroll |
|-----|----------------------------------|
| Less than age 25 | $0.152 |
| Age 25-29 | $0.199 |
| Age 30-34 | $0.256 |
| Age 35-39 | $0.389 |
| Age 40-44 | $0.543 |
| Age 45-49 | $0.759 |
| Age 50-54 | $0.967 |
| Age 55-59 | $1.129 |
| Age 60-64 | $0.825 |
| Age 65-69 | $0.417 |
| Age 70 and over | $0.247 |

Covered Payroll for an Employee will mean his or her Covered Earnings for the insurance month prior to the date the determination is made. However, an Employee's Covered Payroll will not include any part of his or her monthly Covered Earnings which exceed $8,333. For premium calculation purposes, any change in an Employee's Covered Earnings will be effective on the September 1 coinciding with or following the date of the change.

TL-004774

7

## SCHEDULE OF BENEFITS FOR CLASS 2

**Eligibility Waiting Period**

For Employees hired on or before the Policy Effective Date:

1st of the month following or coincident with 3 months from date of hire.

For Employees hired after the Policy Effective Date:

1st of the month following or coincident with 3 months from date of hire.

**Definition of Disability/Disabled**

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
1. unable to perform the material duties of his or her Regular Occupation; and
2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.

After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:
1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
2. unable to earn 60% or more of his or her Indexed Earnings.

The Insurance Company will require proof of earnings and continued Disability.

**Definition of Optimum Ability**
1. for the first 24 months that benefits are payable, the greatest extent of work the Employee is able to do in his or her Regular Occupation;
2. after 24 months, the greatest extent of work the Employee is able to do in any occupation based on education, training or experience.

The Employee's ability to work is based on the following:
1. medical evidence submitted by the Employee;
2. consultation with the Employee's Physician; and
3. evaluation of the Employee's ability to work by not more than three Independent Experts if required by the Insurance Company.

There is no cost to the Employee for evaluation by an Independent Expert when required by the Insurance Company to determine Optimum Ability.

The Independent Expert must be:
1. licensed, registered or certified as required by the laws of the state in which the evaluation is made; and
2. acting within the scope of that license, registration or certificate.

**Definition of Covered Earnings**

Covered Earnings means an Employee's wage or salary as reported by the Employer for work performed for the Employer as in effect just prior to the date Disability begins. Covered Earnings are determined initially on the date an Employee applies for coverage. A change in the amount of Covered Earnings is effective on the date of change, if the Employer gives us written notice of the change and the required premium is paid.

8

It includes shift differentials, but not amounts received as bonus, commissions, overtime pay or other extra compensation.

Any increase in an Employee's Covered Earnings will not be effective during a period of continuous Disability.

| | |
|---|---|
| **Elimination Period** | 180 days |
| **Gross Disability Benefit** | The lesser of 60% of an Employee's monthly Covered Earnings rounded to the nearest dollar or the Maximum Disability Benefit. |
| **Maximum Disability Benefit** | $4,000 per month |
| **Minimum Disability Benefit** | The greater of $100 or 10% of an Employee's Monthly Benefit prior to any reductions for Other Income Benefits. |

**Disability Benefit Calculation**

The Disability Benefit payable to the Employee is figured using the Gross Disability Benefit, Other Income Benefits, calculation of Optimum Ability and the Return to Work Incentive. Monthly Benefits are based on a 30-day month. The Disability Benefit will be prorated if payable for any period less than a month.

During any month the Employee has no Disability Earnings, the monthly benefit payable is the Gross Disability Benefit less Other Income Benefits, and less the calculation for Optimum Ability. During any month the Employee has Disability Earnings, benefits are determined under the Return to Work Incentive. Benefits will not be less than the minimum benefit shown in the Schedule of Benefits except as provided under the section Minimum Benefit.

"Other Income Benefits" means any benefits listed in the Other Income Benefits provision that an Employee receives on his or her own behalf.

*Return to Work Incentive*

During any month the Employee has Disability Earnings, his or her benefits will be calculated as follows.

The Employee's monthly benefit payable will be calculated as follows during the first 24 months disability benefits are payable and the Employee has Disability Earnings:

1.  Add the Employee's Gross Disability Benefit and Disability Earnings.
2.  Compare the sum from 1. to the Employee's Indexed Earnings.
3.  If the sum from 1. exceeds 100% of the Employee's Indexed Earnings, then subtract the Indexed Earnings from the sum in 1.
4.  The Employee's Gross Disability Benefit will be reduced by the difference from 3., as well as by Other Income Benefits and the calculation for Optimum Ability.
5.  If the sum from 1. does not exceed 100% of the Employee's Indexed Earnings, the Employee's Gross Disability Benefit will be reduced by Other Income Benefits and the calculation for Optimum Ability.

After disability benefits are payable for 24 months, the monthly benefit payable is the Gross Disability Benefit reduced by Other Income Benefits, the calculation for Optimum Ability and 50% of Disability Earnings.

No Disability Benefits will be paid, and insurance will end if the Insurance Company determines the Employee is able to work under a modified work arrangement and he or she refuses to do so without Good Cause.

*Calculation for Optimum Ability*
The calculation for Optimum Ability is the earnings the Employee could earn if working at Optimum Ability, minus Disability Earnings.

## Additional Benefits

*Cost Of Living Adjustment (COLA) Benefit*
This Benefit does not apply to this class of Employee.

*Survivor Benefit*

| | |
|---|---|
| Amount of Benefit: | 100% of the sum of the last full Disability Benefit plus the amount of any Disability Earnings by which the benefit had been reduced for that month. |
| Maximum Benefit Period | A single lump sum payment equal to 3 monthly Survivor Benefits. |

## Maximum Benefit Period

| Age When Disability Begins | Maximum Benefit Period |
|---|---|
| Age 61 or under | The Employee's 65th birthday. |
| Age 62 | The date the 42nd Monthly Benefit is payable. |
| Age 63 | The date the 36th Monthly Benefit is payable. |
| Age 64 | The date the 30th Monthly Benefit is payable. |
| Age 65 | The date the 30th Monthly Benefit is payable. |
| Age 66 | The date the 27th Monthly Benefit is payable. |
| Age 67 | The date the 24th Monthly Benefit is payable. |
| Age 68 | The date the 21st Monthly Benefit is payable. |
| Age 69 and over | The date the 18th Monthly Benefit is payable. |

## Initial Premium Rates

$.986 per $100 of Covered Payroll

Covered Payroll for an Employee will mean his or her Covered Earnings for the insurance month prior to the date the determination is made. However, an Employee's Covered Payroll will not include any part of his or her monthly Covered Earnings which exceed $6,667. For premium calculation purposes, any change in an Employee's Covered Earnings will be effective on the September 1 coinciding with or following the date of the change.

TL-004774

## SCHEDULE OF BENEFITS FOR CLASS 3

**Eligibility Waiting Period**

For Employees hired on or before the Policy Effective Date:

1st of the month following or coincident with 3 months from date of hire.

For Employees hired after the Policy Effective Date:

1st of the month following or coincident with 3 months from date of hire.

**Definition of Disability/Disabled**

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
1. unable to perform the material duties of his or her Regular Occupation; and
2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.

After Disability Benefits have been payable for 60 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:
1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
2. unable to earn 80% or more of his or her Indexed Earnings.

The Insurance Company will require proof of earnings and continued Disability.

**Definition of Optimum Ability**

1. for the first 60 months that benefits are payable, the greatest extent of work the Employee is able to do in his or her Regular Occupation;
2. after 60 months, the greatest extent of work the Employee is able to do in any occupation based on education, training or experience.

The Employee's ability to work is based on the following:
1. medical evidence submitted by the Employee;
2. consultation with the Employee's Physician; and
3. evaluation of the Employee's ability to work by not more than three Independent Experts if required by the Insurance Company.

There is no cost to the Employee for evaluation by an Independent Expert when required by the Insurance Company to determine Optimum Ability.

The Independent Expert must be:
1. licensed, registered or certified as required by the laws of the state in which the evaluation is made; and
2. acting within the scope of that license, registration or certificate.

**Definition of Covered Earnings**

Covered Earnings means an Employee's wage or salary as reported by the Employer for work performed for the Employer as in effect just prior to the date Disability begins. Covered Earnings are determined initially on the date an Employee applies for coverage. A change in the amount of Covered Earnings is effective on the date of change, if the Employer gives us written notice of the change and the required premium is paid.

It includes shift differentials, but not amounts received as bonus, commissions, overtime pay or other extra compensation.

Any increase in an Employee's Covered Earnings will not be effective during a period of continuous Disability.

| | |
|---|---|
| **Elimination Period** | 180 days |
| **Gross Disability Benefit** | The lesser of 60% of an Employee's monthly Covered Earnings rounded to the nearest dollar or the Maximum Disability Benefit. |
| **Maximum Disability Benefit** | $15,000 per month |
| **Minimum Disability Benefit** | The greater of $100 or 10% of an Employee's Monthly Benefit prior to any reductions for Other Income Benefits. |

**Disability Benefit Calculation**

The Disability Benefit payable to the Employee is figured using the Gross Disability Benefit, Other Income Benefits, calculation of Optimum Ability and the Return to Work Incentive. Monthly Benefits are based on a 30-day month. The Disability Benefit will be prorated if payable for any period less than a month.

During any month the Employee has no Disability Earnings, the monthly benefit payable is the Gross Disability Benefit less Other Income Benefits, and less the calculation for Optimum Ability. During any month the Employee has Disability Earnings, benefits are determined under the Return to Work Incentive. Benefits will not be less than the minimum benefit shown in the Schedule of Benefits except as provided under the section Minimum Benefit.

"Other Income Benefits" means any benefits listed in the Other Income Benefits provision that an Employee receives on his or her own behalf or for dependents, or which the Employee's dependents receive because of the Employee's entitlement to Other Income Benefits.

*Return to Work Incentive*
During any month the Employee has Disability Earnings, his or her benefits will be calculated as follows.

The Employee's monthly benefit payable will be calculated as follows during the first 24 months disability benefits are payable and the Employee has Disability Earnings:

1.  Add the Employee's Gross Disability Benefit and Disability Earnings.
2.  Compare the sum from 1. to the Employee's Indexed Earnings.
3.  If the sum from 1. exceeds 100% of the Employee's Indexed Earnings, then subtract the Indexed Earnings from the sum in 1.
4.  The Employee's Gross Disability Benefit will be reduced by the difference from 3., as well as by Other Income Benefits and the calculation for Optimum Ability.
5.  If the sum from 1. does not exceed 100% of the Employee's Indexed Earnings, the Employee's Gross Disability Benefit will be reduced by Other Income Benefits and the calculation for Optimum Ability.

After disability benefits are payable for 24 months, the monthly benefit payable is the Gross Disability Benefit reduced by Other Income Benefits, the calculation for Optimum Ability and 50% of Disability Earnings.

No Disability Benefits will be paid, and insurance will end if the Insurance Company determines the Employee is able to work under a modified work arrangement and he or she refuses to do so without Good Cause.

*Calculation for Optimum Ability*
The calculation for Optimum Ability is the earnings the Employee could earn if working at Optimum Ability, minus Disability Earnings.

## Additional Benefits

*Cost Of Living Adjustment (COLA)*

| | |
|---|---|
| Benefit Waiting Period: | After 12 Monthly Benefits are payable |
| COLA Increase: | 3% |
| COLA Increase Date: | January 1 |

*Survivor Benefit*

| | |
|---|---|
| Amount of Benefit: | 100% of the sum of the last full Disability Benefit plus the amount of any Disability Earnings by which the benefit had been reduced for that month. |
| Maximum Benefit Period | A single lump sum payment equal to 3 monthly Survivor Benefits. |

## Maximum Benefit Period

Up to the Employee's Social Security Normal Retirement Age as defined by the 1983 Amendments to the United States Social Security Act and determined by the Employee's year of birth as follows.

| Birth Year | Retirement Age |
|---|---|
| 1937 and earlier | 65 years |
| 1938 | 65 years and 2 months |
| 1939 | 65 years and 4 months |
| 1940 | 65 years and 6 months |
| 1941 | 65 years and 8 months |
| 1942 | 65 years and 10 months |
| 1943 - 1954 | 66 years |
| 1955 | 66 years and 2 months |
| 1956 | 66 years and 4 months |
| 1957 | 66 years and 6 months |
| 1958 | 66 years and 8 months |
| 1959 | 66 years and 10 months |
| 1960 and over | 67 years |

## Initial Premium Rates

$.77 per $100 of Covered Payroll

Covered Payroll for an Employee will mean his or her Covered Earnings for the insurance month prior to the date the determination is made. However, an Employee's Covered Payroll will not include any part of his or her monthly Covered Earnings which exceed $25,000. For premium calculation purposes, any change in an Employee's Covered Earnings will be effective on the September 1 coinciding with or following the date of the change.

TL-004774

## SCHEDULE OF BENEFITS FOR CLASS 4

**Eligibility Waiting Period**

For Employees hired on or before the Policy Effective Date:          Not Applicable.

For Employees hired after the Policy Effective Date:          Not Applicable.

**Definition of Disability/Disabled**

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:

1.       unable to perform the material duties of his or her Regular Occupation; and
2.       unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.

After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:

1.       unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
2.       unable to earn 60% or more of his or her Indexed Earnings.

The Insurance Company will require proof of earnings and continued Disability.

**Definition of Optimum Ability**

1.       for the first 24 months that benefits are payable, the greatest extent of work the Employee is able to do in his or her Regular Occupation;
2.       after 24 months, the greatest extent of work the Employee is able to do in any occupation based on education, training or experience.

The Employee's ability to work is based on the following:

1.       medical evidence submitted by the Employee;
2.       consultation with the Employee's Physician; and
3.       evaluation of the Employee's ability to work by not more than three Independent Experts if required by the Insurance Company.

There is no cost to the Employee for evaluation by an Independent Expert when required by the Insurance Company to determine Optimum Ability.

The Independent Expert must be:

1.       licensed, registered or certified as required by the laws of the state in which the evaluation is made; and
2.       acting within the scope of that license, registration or certificate.

**Definition of Covered Earnings**

Covered Earnings means an Employee's wage or salary as reported by the Employer for work performed for the Employer as in effect just prior to the date Disability begins.  Covered Earnings are determined initially on the date an Employee applies for coverage.  A change in the amount of Covered Earnings is effective on the date of change, if the Employer gives us written notice of the change and the required premium is paid.

It includes shift differentials, but not amounts received as bonus, commissions, overtime pay or other extra compensation.

Any increase in an Employee's Covered Earnings will not be effective during a period of continuous Disability.

| **Elimination Period** | |
|---|---|
| Core Plan | 180 days |
| Optional Plan | 180 days |

| **Gross Disability Benefit** | |
|---|---|
| Core Plan | The lesser of 60% of an Employee's monthly Covered Earnings rounded to the nearest dollar or the Maximum Disability Benefit. |
| Optional Plan | The lesser of 60% of an Employee's monthly Covered Earnings rounded to the nearest dollar or the Maximum Disability Benefit. |

| **Maximum Disability Benefit** | |
|---|---|
| Core Plan | $5,000 per month |
| Optional Plan | $5,000 per month |

| **Minimum Disability Benefit** | |
|---|---|
| Core Plan | The greater of $100 or 10% of an Employee's Monthly Benefit prior to any reductions for Other Income Benefits. |
| Optional Plan | The greater of $100 or 10% of an Employee's Monthly Benefit prior to any reductions for Other Income Benefits. |

**Disability Benefit Calculation**

The Disability Benefit payable to the Employee is figured using the Gross Disability Benefit, Other Income Benefits, calculation of Optimum Ability and the Return to Work Incentive. Monthly Benefits are based on a 30-day month. The Disability Benefit will be prorated if payable for any period less than a month.

During any month the Employee has no Disability Earnings, the monthly benefit payable is the Gross Disability Benefit less Other Income Benefits, and less the calculation for Optimum Ability. During any month the Employee has Disability Earnings, benefits are determined under the Return to Work Incentive. Benefits will not be less than the minimum benefit shown in the Schedule of Benefits except as provided under the section Minimum Benefit.

"Other Income Benefits" means any benefits listed in the Other Income Benefits provision that an Employee receives on his or her own behalf.

*Return to Work Incentive*
During any month the Employee has Disability Earnings, his or her benefits will be calculated as follows.

The Employee's monthly benefit payable will be calculated as follows during the first 24 months disability benefits are payable and the Employee has Disability Earnings:

1. Add the Employee's Gross Disability Benefit and Disability Earnings.
2. Compare the sum from 1. to the Employee's Indexed Earnings.
3. If the sum from 1. exceeds 100% of the Employee's Indexed Earnings, then subtract the Indexed Earnings from the sum in 1.
4. The Employee's Gross Disability Benefit will be reduced by the difference from 3., as well as by Other Income Benefits and the calculation for Optimum Ability.

15

5. If the sum from 1. does not exceed 100% of the Employee's Indexed Earnings, the Employee's Gross Disability Benefit will be reduced by Other Income Benefits and the calculation for Optimum Ability.

After disability benefits are payable for 24 months, the monthly benefit payable is the Gross Disability Benefit reduced by Other Income Benefits, the calculation for Optimum Ability and 50% of Disability Earnings.

No Disability Benefits will be paid, and insurance will end if the Insurance Company determines the Employee is able to work under a modified work arrangement and he or she refuses to do so without Good Cause.

*Calculation for Optimum Ability*
The calculation for Optimum Ability is the earnings the Employee could earn if working at Optimum Ability, minus Disability Earnings.

**Additional Benefits**

*Cost Of Living Adjustment (COLA) Benefit*
This Benefit does not apply to this class of Employee.

*Survivor Benefit*

| | |
|---|---|
| Amount of Benefit: | 100% of the sum of the last full Disability Benefit plus the amount of any Disability Earnings by which the benefit had been reduced for that month. |
| Maximum Benefit Period | A single lump sum payment equal to 3 monthly Survivor Benefits. |

**Maximum Benefit Period**
Core Plan

| Age When Disability Begins | Maximum Benefit Period |
|---|---|
| Age 65 or under | The date the 24th Monthly Benefit is payable. |
| Age 66 | The date the 21st Monthly Benefit is payable. |
| Age 67 | The date the 18th Monthly Benefit is payable. |
| Age 68 | The date the 15th Monthly Benefit is payable. |
| Age 69 and over | The date the 12th Monthly Benefit is payable. |

Optional Plan

| Age When Disability Begins | Maximum Benefit Period |
|---|---|
| Age 61 or under | The Employee's 65th birthday. |
| Age 62 | The date the 42nd Monthly Benefit is payable. |
| Age 63 | The date the 36th Monthly Benefit is payable. |
| Age 64 | The date the 30th Monthly Benefit is payable. |
| Age 65 | The date the 30th Monthly Benefit is payable. |
| Age 66 | The date the 27th Monthly Benefit is payable. |
| Age 67 | The date the 24th Monthly Benefit is payable. |
| Age 68 | The date the 21st Monthly Benefit is payable. |
| Age 69 and over | The date the 18th Monthly Benefit is payable. |

16

**Initial Premium Rates**

Core Plan                              $.274 per $100 of Covered Payroll

Optional Plan

| Age | Rate per $100 of Covered Payroll |
|---|---|
| Less than age 25 | $0.152 |
| Age 25-29 | $0.199 |
| Age 30-34 | $0.256 |
| Age 35-39 | $0.389 |
| Age 40-44 | $0.543 |
| Age 45-49 | $0.759 |
| Age 50-54 | $0.967 |
| Age 55-59 | $1.129 |
| Age 60-64 | $0.825 |
| Age 65-69 | $0.417 |
| Age 70 and over | $0.247 |

Covered Payroll for an Employee will mean his or her Covered Earnings for the insurance month prior to the date the determination is made. However, an Employee's Covered Payroll will not include any part of his or her monthly Covered Earnings which exceed $8,333. For premium calculation purposes, any change in an Employee's Covered Earnings will be effective on the September 1 coinciding with or following the date of the change.

TL-004774

## SCHEDULE OF BENEFITS FOR CLASS 5

**Eligibility Waiting Period**

For Employees hired on or before the Policy Effective Date:          Not Applicable.

For Employees hired after the Policy Effective Date:          Not Applicable.

**Definition of Disability/Disabled**
The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
1.  unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
2.  unable to earn 60% or more of his or her Indexed Earnings.

The Insurance Company will require proof of continued Disability.

**Definition of Optimum Ability**
The greatest extent of work the Employee is able to do in any occupation based on education, training or experience.

The Employee's ability to work is based on the following:
1.  medical evidence submitted by the Employee;
2.  consultation with the Employee's Physician; and
3.  evaluation of the Employee's ability to work by not more than three Independent Experts if required by the Insurance Company.

There is no cost to the Employee for evaluation by an Independent Expert when required by the Insurance Company to determine Optimum Ability.

The Independent Expert must be:
1.  licensed, registered or certified as required by the laws of the state in which the evaluation is made; and
2.  acting within the scope of that license, registration or certificate.

**Definition of Covered Earnings**
Covered Earnings means an Employee's wage or salary as reported by the Employer for work performed for the Employer as in effect just prior to the date Disability begins.  Covered Earnings are determined initially on the date an Employee applies for coverage.  A change in the amount of Covered Earnings is effective on the date of change, if the Employer gives us written notice of the change and the required premium is paid.

It includes shift differentials, but not amounts received as bonus, commissions, overtime pay or other extra compensation.

Any increase in an Employee's Covered Earnings will not be effective during a period of continuous Disability.

| | |
|---|---|
| **Elimination Period** | 30 months |
| **Gross Disability Benefit** | The lesser of 60% of an Employee's monthly Covered Earnings rounded to the nearest dollar or the Maximum Disability Benefit. |
| **Maximum Disability Benefit** | $5,000 per month |

18

**Minimum Disability Benefit**            The greater of $100 or 10% of an Employee's Monthly Benefit prior to any reductions for Other Income Benefits.

**Disability Benefit Calculation**
The Disability Benefit payable to the Employee is figured using the Gross Disability Benefit, Other Income Benefits, calculation of Optimum Ability and the Return to Work Incentive. Monthly Benefits are based on a 30-day month. The Disability Benefit will be prorated if payable for any period less than a month.

During any month the Employee has no Disability Earnings, the monthly benefit payable is the Gross Disability Benefit less Other Income Benefits, and less the calculation for Optimum Ability. During any month the Employee has Disability Earnings, benefits are determined under the Return to Work Incentive. Benefits will not be less than the minimum benefit shown in the Schedule of Benefits except as provided under the section Minimum Benefit.

"Other Income Benefits" means any benefits listed in the Other Income Benefits provision that an Employee receives on his or her own behalf.

*Return to Work Incentive*
During any month the Employee has Disability Earnings, his or her benefits will be calculated as follows.

The Employee's monthly benefit payable will be calculated as follows during the first 24 months disability benefits are payable and the Employee has Disability Earnings:

1. Add the Employee's Gross Disability Benefit and Disability Earnings.
2. Compare the sum from 1. to the Employee's Indexed Earnings.
3. If the sum from 1. exceeds 100% of the Employee's Indexed Earnings, then subtract the Indexed Earnings from the sum in 1.
4. The Employee's Gross Disability Benefit will be reduced by the difference from 3., as well as by Other Income Benefits and the calculation for Optimum Ability.
5. If the sum from 1. does not exceed 100% of the Employee's Indexed Earnings, the Employee's Gross Disability Benefit will be reduced by Other Income Benefits and the calculation for Optimum Ability.

After disability benefits are payable for 24 months, the monthly benefit payable is the Gross Disability Benefit reduced by Other Income Benefits, the calculation for Optimum Ability and 50% of Disability Earnings.

No Disability Benefits will be paid, and insurance will end if the Insurance Company determines the Employee is able to work under a modified work arrangement and he or she refuses to do so without Good Cause.

*Calculation for Optimum Ability*
The calculation for Optimum Ability is the earnings the Employee could earn if working at Optimum Ability, minus Disability Earnings.

**Additional Benefits**

*Cost Of Living Adjustment (COLA) Benefit*
This Benefit does not apply to this class of Employee.

*Survivor Benefit*

| | |
|---|---|
| Amount of Benefit: | 100% of the sum of the last full Disability Benefit plus the amount of any Disability Earnings by which the benefit had been reduced for that month. |
| Maximum Benefit Period | A single lump sum payment equal to 3 monthly Survivor Benefits. |

**Maximum Benefit Period**

| Age When Disability Begins | Maximum Benefit Period |
|---|---|
| Age 61 or under | The Employee's 65th birthday. |
| Age 62 | The date the 42nd Monthly Benefit is payable. |
| Age 63 | The date the 36th Monthly Benefit is payable. |
| Age 64 | The date the 30th Monthly Benefit is payable. |
| Age 65 | The date the 30th Monthly Benefit is payable. |
| Age 66 | The date the 27th Monthly Benefit is payable. |
| Age 67 | The date the 24th Monthly Benefit is payable. |
| Age 68 | The date the 21st Monthly Benefit is payable. |
| Age 69 and over | The date the 18th Monthly Benefit is payable. |

**Initial Premium Rates**

| Age | Rate per $100 of Covered Payroll |
|---|---|
| Less than age 25 | $0.152 |
| Age 25-29 | $0.199 |
| Age 30-34 | $0.256 |
| Age 35-39 | $0.389 |
| Age 40-44 | $0.543 |
| Age 45-49 | $0.759 |
| Age 50-54 | $0.967 |
| Age 55-59 | $1.129 |
| Age 60-64 | $0.825 |
| Age 65-69 | $0.417 |
| Age 70 and over | $0.247 |

Covered Payroll for an Employee will mean his or her Covered Earnings for the insurance month prior to the date the determination is made. However, an Employee's Covered Payroll will not include any part of his or her monthly Covered Earnings which exceed $8,333. For premium calculation purposes, any change in an Employee's Covered Earnings will be effective on the September 1 coinciding with or following the date of the change.

TL-004774

20

## SCHEDULE OF BENEFITS FOR CLASS 6

**Eligibility Waiting Period**

For Employees hired on or before the Policy Effective Date:  No Waiting Period

For Employees hired after the Policy Effective Date:  No Waiting Period

**Definition of Disability/Disabled**

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
1.  unable to perform the material duties of his or her Regular Occupation; and
2.  unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.

After Disability Benefits have been payable for 60 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:
1.  unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
2.  unable to earn 80% or more of his or her Indexed Earnings.

The Insurance Company will require proof of earnings and continued Disability.

**Definition of Optimum Ability**

1.  for the first 24 months that benefits are payable, the greatest extent of work the Employee is able to do in his or her Regular Occupation;
2.  after 24 months, the greatest extent of work the Employee is able to do in any occupation based on education, training or experience.

The Employee's ability to work is based on the following:
1.  medical evidence submitted by the Employee;
2.  consultation with the Employee's Physician; and
3.  evaluation of the Employee's ability to work by not more than three Independent Experts if required by the Insurance Company.

There is no cost to the Employee for evaluation by an Independent Expert when required by the Insurance Company to determine Optimum Ability.

The Independent Expert must be:
1.  licensed, registered or certified as required by the laws of the state in which the evaluation is made; and
2.  acting within the scope of that license, registration or certificate.

**Definition of Covered Earnings**

Covered Earnings means an Employee's wage or salary as reported by the Employer for work performed for the Employer as in effect just prior to the date Disability begins. Covered Earnings are determined initially on the date an Employee applies for coverage. A change in the amount of Covered Earnings is effective on the date of change, if the Employer gives us written notice of the change and the required premium is paid.

It includes shift differentials, but not amounts received as bonus, commissions, overtime pay or other extra compensation.

Any increase in an Employee's Covered Earnings will not be effective during a period of continuous Disability.

| | |
|---|---|
| **Elimination Period** | 180 days |
| **Gross Disability Benefit** | The lesser of 60% of an Employee's monthly Covered Earnings rounded to the nearest dollar or the Maximum Disability Benefit. |
| **Maximum Disability Benefit** | $12,500 |
| **Minimum Disability Benefit** | The greater of $100 or 10% of an Employee's Monthly Benefit prior to any reductions for Other Income Benefits. |

**Disability Benefit Calculation**

The Disability Benefit payable to the Employee is figured using the Gross Disability Benefit, Other Income Benefits, calculation of Optimum Ability and the Return to Work Incentive. Monthly Benefits are based on a 30-day month. The Disability Benefit will be prorated if payable for any period less than a month.

During any month the Employee has no Disability Earnings, the monthly benefit payable is the Gross Disability Benefit less Other Income Benefits, and less the calculation for Optimum Ability. During any month the Employee has Disability Earnings, benefits are determined under the Return to Work Incentive. Benefits will not be less than the minimum benefit shown in the Schedule of Benefits except as provided under the section Minimum Benefit.

"Other Income Benefits" means any benefits listed in the Other Income Benefits provision that an Employee receives on his or her own behalf.

*Return to Work Incentive*

During any month the Employee has Disability Earnings, his or her benefits will be calculated as follows.

The Employee's monthly benefit payable will be calculated as follows during the first 24 months disability benefits are payable and the Employee has Disability Earnings:

1. Add the Employee's Gross Disability Benefit and Disability Earnings.
2. Compare the sum from 1. to the Employee's Indexed Earnings.
3. If the sum from 1. exceeds 100% of the Employee's Indexed Earnings, then subtract the Indexed Earnings from the sum in 1.
4. The Employee's Gross Disability Benefit will be reduced by the difference from 3., as well as by Other Income Benefits and the calculation for Optimum Ability.
5. If the sum from 1. does not exceed 100% of the Employee's Indexed Earnings, the Employee's Gross Disability Benefit will be reduced by Other Income Benefits and the calculation for Optimum Ability.

After disability benefits are payable for 24 months, the monthly benefit payable is the Gross Disability Benefit reduced by Other Income Benefits, the calculation for Optimum Ability and 50% of Disability Earnings.

No Disability Benefits will be paid, and insurance will end if the Insurance Company determines the Employee is able to work under a modified work arrangement and he or she refuses to do so without Good Cause.

*Calculation for Optimum Ability*
The calculation for Optimum Ability is the earnings the Employee could earn if working at Optimum Ability, minus Disability Earnings.

## Additional Benefits

*Cost Of Living Adjustment (COLA)*

| | |
|---|---|
| Benefit Waiting Period: | After 12 Monthly Benefits are payable |
| COLA Increase: | 3% |
| COLA Increase Date: | January 1 |

*Survivor Benefit*

| | |
|---|---|
| Amount of Benefit: | 100% of the sum of the last full Disability Benefit plus the amount of any Disability Earnings by which the benefit had been reduced for that month. |
| Maximum Benefit Period | A single lump sum payment equal to 3 monthly Survivor Benefits. |

## Maximum Benefit Period

| Age When Disability Begins | Maximum Benefit Period |
|---|---|
| Age 61 or under | The Employee's 65th birthday. |
| Age 62 | The date the 42nd Monthly Benefit is payable. |
| Age 63 | The date the 36th Monthly Benefit is payable. |
| Age 64 | The date the 30th Monthly Benefit is payable. |
| Age 65 | The date the 30th Monthly Benefit is payable. |
| Age 66 | The date the 27th Monthly Benefit is payable. |
| Age 67 | The date the 24th Monthly Benefit is payable. |
| Age 68 | The date the 21st Monthly Benefit is payable. |
| Age 69 and over | The date the 18th Monthly Benefit is payable. |

## Initial Premium Rates

$.986 per $100 of Covered Payroll

Covered Payroll for an Employee will mean his or her Covered Earnings for the insurance month prior to the date the determination is made. However, an Employee's Covered Payroll will not include any part of his or her monthly Covered Earnings which exceed $20,833. For premium calculation purposes, any change in an Employee's Covered Earnings will be effective on the September 1 coinciding with or following the date of the change.

TL-004774

## ELIGIBILITY FOR INSURANCE

An Employee in one of the Classes of Eligible Employees shown in the Schedule of Benefits is eligible to be insured on the Policy Effective Date, or the day after he or she completes the Eligibility Waiting Period, if later. The Eligibility Waiting Period is the period of time the Employee must be in Active Service to be eligible for coverage. It will be extended by the number of days the Employee is not in Active Service.

Except as noted in the Reinstatement Provision, if an Employee terminates coverage and later wishes to reapply, or if a former Employee is rehired, a new Eligibility Waiting Period must be satisfied. An Employee is not required to satisfy a new Eligibility Waiting Period if insurance ends because he or she is no longer in a Class of Eligible Employees, but continues to be employed and within one year becomes a member of an eligible class.

TL-004710

## EFFECTIVE DATE OF INSURANCE

An Employee will be insured on the date he or she becomes eligible, if the Employee is not required to contribute to the cost of this insurance.

An Employee who is required to contribute to the cost of this insurance may elect to be insured only by authorizing payroll deduction in a form approved by the Employer and the Insurance Company. The effective date of this insurance depends on the date coverage is elected.

Insurance for an Employee who applies for coverage within 31 days after he or she becomes eligible, during an Annual Enrollment Period or within 31 days after a Life Status Change, is effective on the latest of the following dates.
1.    The Policy Effective Date.
2.    The date payroll deduction is authorized.
3.    The date the Employer or Insurance Company receives the completed enrollment form.

If an Employee is not in Active Service on the date insurance would otherwise be effective, it will be effective on the date he or she returns to any occupation for the Employer on a Full-time basis.

TL-004712

## TERMINATION OF INSURANCE

An Employee's coverage will end on the earliest of the following dates:
1.    the date the Employee is eligible for coverage under a plan intended to replace this coverage;
2.    the date the Policy is terminated;
3.    the date the Employee is no longer in an eligible class;
4.    the day after the end of the period for which premiums are paid;
5.    the date the Employee is no longer in Active Service;
6.    the date benefits end for failure to comply with the terms and conditions of the Policy.

Disability Benefits will be payable to an Employee who is entitled to receive Disability Benefits when the Policy terminates, if he or she remains disabled and meets the requirements of the Policy. Any period of Disability, regardless of cause, that begins when the Employee is eligible under another group disability coverage provided by any employer, will not be covered.

TL-007505.00

## CONTINUATION OF INSURANCE

This Continuation of Insurance provision modifies the Termination of Insurance provision to allow insurance to continue under certain circumstances if the Insured Employee is no longer in Active Service. Insurance that is continued under this provision is subject to all other terms of the Termination of Insurance provisions.

Disability Insurance continues if an Employee's Active Service ends due to a Disability for which benefits under the Policy are or may become payable.  Premiums for the Employee will be waived while Disability Benefits are payable.  If the Employee does not return to Active Service, this insurance ends when the Disability ends or when benefits are no longer payable, whichever occurs first.

If an Employee's Active Service ends due to personal or family medical leave approved timely by the Employer, insurance will continue for an Employee for up to 12 weeks, if the required premium is paid when due.

If an Employee's Active Service ends due to any leave of absence approved in writing by the Employer prior to the date the Employee ceases work insurance will continue for an Employee for up to 6 months if the required premium is paid.  An approved leave of absence does not include layoff or termination of employment.

If an Employee's Active Service ends due to any other excused short term absence from work that is reported to the Employer timely in accordance with the Employer's reporting requirements for such short term absence, insurance for an Employee will continue until the earlier of:
a.   the date the Employee's employment relationship with the Employer terminates;
b.   the date premiums are not paid when due;
c.   the end of the 30 day period that begins with the first day of such excused absence;
d.   the end of the period for which such short term absence is excused by the Employer.

Notwithstanding any other provision of this policy, if an Employee's Active Service ends due to layoff, termination of employment, or any other termination of the employment relationship, insurance will terminate and Continuation of Insurance under this provision will not apply.

If an Employee's insurance is continued pursuant to this Continuation of Insurance provision, and he or she becomes Disabled during such period of continuation, Disability Benefits will not begin until the later of the date the Elimination Period is satisfied or the date he or she is scheduled to return to Active Service.

TL-004716

## TAKEOVER PROVISION

This provision applies only to Employees eligible under this Policy who were covered for long term disability coverage on the day prior to the effective date of this Policy under the Prior Plan provided by the Policyholder or by an entity that has been acquired by the Policyholder.

A. This section A applies to Employees who are not in Active Service on the day prior to the effective date of this Policy due to a reason for which the Prior Plan and this Policy both provide for continuation of insurance. If required premium is paid when due, the Insurance Company will insure an Employee to which this section applies against a disability that occurs after the effective date of this Policy for the affected employee group. This coverage will be provided until the earlier of the date: (a) the employee returns to Active Service, (b) continuation of insurance under the Prior Plan would end but for termination of that plan; or (c) the date continuation of insurance under this Policy would end if computed from the first day the employee was not in Active Service. The Policy will provide this coverage as follows:

   1. If benefits for a disability are covered under the Prior Plan, no benefits are payable under this Plan.
   2. If the disability is not a covered disability under the Prior Plan solely because the plan terminated, benefits payable under this Policy for that disability will be the lesser of: (a) the disability benefits that would have been payable under the Prior Plan; and (b) those provided by this Policy. Credit will be given for partial completion under the Prior Plan of Elimination Periods and partial satisfaction of pre-existing condition limitations.

B. The Elimination Period under this Policy will be waived for a Disability which begins while the Employee is insured under this Policy if all of the following conditions are met:

   1. The Disability results from the same or related causes as a Disability for which monthly benefits were payable under the Prior Plan;
   2. Benefits are not payable for the Disability under the Prior Plan solely because it is not in effect;
   3. An Elimination Period would not apply to the Disability if the Prior Plan had not ended;
   4. The Disability begins within 6 months of the Employee's return to Active Service and the Employee's insurance under this Policy is continuous from this Policy's Effective Date.

C. Except for any amount of benefit in excess of a Prior Plan's benefits, the Pre-existing Condition Limitation will not apply to an Employee covered under a Prior Plan who satisfied the pre-existing condition limitation, if any, under that plan. If an Employee, covered under a Prior Plan, did not fully satisfy the pre-existing condition limitation of that plan, credit will be given for any time that was satisfied

Benefits will be determined based on the lesser of: (1) the amount of the gross disability benefit under the Prior Plan and any applicable maximums; and (2) those provided by this Policy.

If benefits are payable under the Prior Plan for the Disability, no benefits are payable under this Policy.

TL-005108

## DESCRIPTION OF BENEFITS

The following provisions explain the benefits available under the Policy. Please see the Schedule of Benefits for the applicability of these benefits to each class of Insureds.

**Disability Benefits**

The Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy. The Employee must satisfy the Elimination Period, be under the Appropriate Care of a Physician, and meet all the other terms and conditions of the Policy. He or she must provide the Insurance Company, at his or her own expense, satisfactory proof of Disability before benefits will be paid. The Disability Benefit is shown in the Schedule of Benefits.

The Insurance Company will require continued proof of the Employee's Disability for benefits to continue.

**Elimination Period**

The Elimination Period is the period of time an Employee must be continuously Disabled before Disability Benefits are payable. The Elimination Period is shown in the Schedule of Benefits.

A period of Disability is not continuous if separate periods of Disability result from unrelated causes.

**Disability Benefit Calculation**

The Disability Benefit Calculation is shown in the Schedule of Benefits. Monthly Disability Benefits are based on a 30 day period. They will be prorated if payable for any period less than a month. If an Employee is working while Disabled, the Disability Benefit Calculation will be the Return to Work Incentive.

**Return to Work Incentive**

The Return to Work Incentive is shown in the Schedule of Benefits. An Employee may work for wage or profit while Disabled. In any month in which the Employee works and a Disability Benefit is payable, the Return to Work Incentive applies.

The Insurance Company will, from time to time, review the Employee's status and will require satisfactory proof of earnings and continued Disability.

**Minimum Benefit**

The Insurance Company will pay the Minimum Benefit shown in the Schedule of Benefits despite any reductions made for Other Income Benefits. The Minimum Benefit will not apply if benefits are being withheld to recover an overpayment of benefits.

**Other Income Benefits – Applicable to Class 3 Only**

An Employee for whom Disability Benefits are payable under this Policy may be eligible for benefits from Other Income Benefits. If so, the Insurance Company may reduce the Disability Benefits by the amount of such Other Income Benefits.

Other Income Benefits include:

1.   any amounts received (or assumed to be received*) by the Employee or his or her dependents under:

- the Canada and Quebec Pension Plans;
- the Railroad Retirement Act;
- any local, state, provincial or federal government disability or retirement plan or law payable for Injury or Sickness provided as a result of employment with the Employer;

- any sick leave or salary continuation plan of the Employer;
- any work loss provision in mandatory "No-Fault" auto insurance.

2.  any Social Security disability or retirement benefits the Employee or any third party receives (or is assumed to receive*) on his or her own behalf or for his or her dependents; or which his or her dependents receive (or are assumed to receive*) because of his or her entitlement to such benefits.

3.  any Retirement Plan benefits funded by the Employer. "Retirement Plan" means any defined benefit or defined contribution plan sponsored or funded by the Employer. It does not include an individual deferred compensation agreement; a profit sharing or any other retirement or savings plan maintained in addition to a defined benefit or other defined contribution pension plan, or any employee savings plan including a thrift, stock option or stock bonus plan, individual retirement account or 401(k) plan.

4.  any proceeds payable under any franchise or group insurance or similar plan. If other insurance applies to the same claim for Disability, and contains the same or similar provision for reduction because of other insurance, the Insurance Company will pay for its pro rata share of the total claim. "Pro rata share" means the proportion of the total benefit that the amount payable under one policy, without other insurance, bears to the total benefits under all such policies.

5.  any amounts received (or assumed to be received*) by the Employee or his or her dependents under any workers' compensation, occupational disease, unemployment compensation law or similar state or federal law payable for Injury or Sickness arising out of work with the Employer, including all permanent and temporary disability benefits. This includes any damages, compromises or settlement paid in place of such benefits, whether or not liability is admitted.

6.  any amounts paid because of loss of earnings or earning capacity through settlement, judgment, arbitration or otherwise, where a third party may be liable, regardless of whether liability is determined.

Dependents include any person who receives (or is assumed to receive*) benefits under any applicable law because of an Employee's entitlement to benefits.

*See the Assumed Receipt of Benefits provision.

**Other Income Benefits – Applicable to Class 1, 2, 4, 5 and 6**
An Employee for whom Disability Benefits are payable under this Policy may be eligible for benefits from Other Income Benefits. If so, the Insurance Company may reduce the Disability Benefits by the amount of such Other Income Benefits.

Other Income Benefits include:
1.  any amounts received (or assumed to be received*) by the Employee under:
    - the Canada and Quebec Pension Plans;
    - the Railroad Retirement Act;
    - any local, state, provincial or federal government disability or retirement plan or law payable for Injury or Sickness provided as a result of employment with the Employer;
    - any sick leave or salary continuation plan of the Employer;
    - any work loss provision in mandatory "No-Fault" auto insurance.

2.  any Social Security disability or retirement benefits the Employee or any third party receives (or is assumed to receive*) on his or her own behalf because of his or her entitlement to such benefits.

3.  any Retirement Plan benefits funded by the Employer. "Retirement Plan" means any defined benefit or defined contribution plan sponsored or funded by the Employer. It does not include an individual deferred compensation agreement; a profit sharing or any other retirement or savings plan maintained in addition to a defined benefit or other defined contribution pension plan, or any employee savings plan including a thrift, stock option or stock bonus plan, individual retirement account or 401(k) plan.

4.  any proceeds payable under any franchise or group insurance or similar plan. If other insurance applies to the same claim for Disability, and contains the same or similar provision for reduction because of other insurance, the Insurance Company will pay for its pro rata share of the total claim. "Pro rata share" means the proportion of the total benefit that the amount payable under one policy, without other insurance, bears to the total benefits under all such policies.

5.  any amounts received (or assumed to be received\*) by the Employee under any workers' compensation, occupational disease, unemployment compensation law or similar state or federal law payable for Injury or Sickness arising out of work with the Employer, including all permanent and temporary disability benefits. This includes any damages, compromises or settlement paid in place of such benefits, whether or not liability is admitted.

6.  any amounts paid because of loss of earnings or earning capacity through settlement, judgment, arbitration or otherwise, where a third party may be liable, regardless of whether liability is determined.

\*See the Assumed Receipt of Benefits provision.

*Increases in Other Income Benefits*
Any increase in Other Income Benefits during a period of Disability due to a cost of living adjustment will not be considered in calculating the Employee's Disability Benefits after the first reduction is made for any Other Income Benefits. This section does not apply to any cost of living adjustment for Disability Earnings.

*Lump Sum Payments*
Other Income Benefits or earnings paid in a lump sum will be prorated over the period for which the sum is given. If no time is stated, the lump sum will be prorated over five years.

If no specific allocation of a lump sum payment is made, then the total payment will be an Other Income Benefit.

*Assumed Receipt of Benefits*
The Insurance Company will assume the Employee (and his or her dependents, if applicable) are receiving benefits for which they are eligible from Other Income Benefits. The Insurance Company will reduce the Employee's Disability Benefits by the amount from Other Income Benefits it estimates are payable to the Employee and his or her dependents.

The Insurance Company will waive Assumed Receipt of Benefits, except for Disability Earnings for work the Employee performs while Disability Benefits are payable, if the Employee:

1.  provides satisfactory proof of application for Other Income Benefits;
2.  signs a Reimbursement Agreement;
3.  provides satisfactory proof that all appeals for Other Income Benefits have been made unless the Insurance Company determines that further appeals are not likely to succeed; and
4.  submits satisfactory proof that Other Income Benefits were denied.

The Insurance Company will not assume receipt of any pension or retirement benefits that are actuarially reduced according to applicable law, until the Employee actually receives them.

29

*Social Security Assistance*
The Insurance Company may help the Employee in applying for Social Security Disability Income (SSDI) Benefits, and may require the Employee to file an appeal if it believes a reversal of a prior decision is possible.

The Insurance Company will reduce Disability Benefits by the amount it estimates the Employee will receive, if the Employee refuses to cooperate with or participate in the Social Security Assistance Program.

**Recovery of Overpayment**
The Insurance Company has the right to recover any benefits it has overpaid. The Insurance Company may use any or all of the following to recover an overpayment:

1.    request a lump sum payment of the overpaid amount;
2.    reduce any amounts payable under this Policy; and/or
3.    take any appropriate collection activity available to it.

The Minimum Benefit amount will not apply when Disability Benefits are reduced in order to recover any overpayment.

If an overpayment is due when the Employee dies, any benefits payable under the Policy will be reduced to recover the overpayment.

**Successive Periods of Disability**
A separate period of Disability will be considered continuous:

1.    if it results from the same or related causes as a prior Disability for which benefits were payable; and
2.    if, after receiving Disability Benefits, the Employee returns to work in his Regular Occupation for less than 6 consecutive months; and
3.    if the Employee earns less than the percentage of Indexed Earnings that would still qualify him or her to meet the definition of Disability/Disabled during at least one month.

Any later period of Disability, regardless of cause, that begins when the Employee is eligible for coverage under another group disability plan provided by any employer will not be considered a continuous period of Disability.

For any separate period of disability which is not considered continuous, the Employee must satisfy a new Elimination Period.

## LIMITATIONS

**Limited Benefit Periods**
The Insurance Company will pay Disability Benefits on a limited basis during an Employee's lifetime for a Disability caused by, or contributed to by, any one or more of the following conditions. Once 24 monthly Disability Benefits have been paid, no further benefits will be payable for any of the following conditions.

1.    Alcoholism
2.    Anxiety disorders
3.    Delusional (paranoid) disorders
4.    Depressive disorders
5.    Drug addiction or abuse
6.    Eating disorders
7.    Mental illness
8.    Somatoform disorders (psychosomatic illness)

If, before reaching his or her lifetime maximum benefit, an Employee is confined in a hospital for more than 14 consecutive days, that period of confinement will not count against his or her lifetime limit. The confinement must be for the Appropriate Care of any of the conditions listed above.

**Pre-Existing Condition Limitation – Applicable to Class 1, 2, 4, 5 and 6**
The Insurance Company will not pay benefits for any period of Disability caused or contributed to by, or resulting from, a Pre-existing Condition. A "Pre-existing Condition" means any Injury or Sickness for which the Employee incurred expenses, received medical treatment, care or services including diagnostic measures, took prescribed drugs or medicines, or for which a reasonable person would have consulted a Physician within 3 months before his or her most recent effective date of insurance.

The Pre-existing Condition Limitation will apply to any added benefits or increases in benefits. This limitation will not apply to a period of Disability that begins after an Employee is covered for at least 12 months after his or her most recent effective date of insurance, or the effective date of any added or increased benefits.

**Pre-Existing Condition Limitation – Applicable to Class 3 only**
The Insurance Company will not pay benefits for any period of Disability caused or contributed to by, or resulting from, a Pre-existing Condition. A "Pre-existing Condition" means any Injury or Sickness for which the Employee incurred expenses, received medical treatment, care or services including diagnostic measures, took prescribed drugs or medicines, or for which a reasonable person would have consulted a Physician within 6 months before his or her most recent effective date of insurance.

The Pre-existing Condition Limitation will apply to any added benefits or increases in benefits. This limitation will not apply to a period of Disability that begins after an Employee is covered for at least 12 months after his or her most recent effective date of insurance, or the effective date of any added or increased benefits.

**Pre-Existing Condition Limitation – Applicable to an Employee who applies for coverage more than 31 days after he or she becomes eligible for this insurance**
The Insurance Company will not pay benefits for any period of Disability caused or contributed to by, or resulting from, a Pre-existing Condition. A "Pre-existing Condition" means any Injury or Sickness for which the Employee incurred expenses, received medical treatment, care or services including diagnostic measures, took prescribed drugs or medicines, or for which a reasonable person would have consulted a Physician within 12 months before his or her most recent effective date of insurance.

The Pre-existing Condition Limitation will apply to any added benefits or increases in benefits. This limitation will not apply to a period of Disability that begins after an Employee is covered for at least 12 months after his or her most recent effective date of insurance, or the effective date of any added or increased benefits.

TL-007500.00

## ADDITIONAL BENEFITS

**Rehabilitation During a Period of Disability**

If the Insurance Company determines that a Disabled Employee is a suitable candidate for rehabilitation, the Insurance Company may require the Employee to participate in a Rehabilitation Plan and assessment at our expense. The Insurance Company has the sole discretion to approve the Employee's participation in a Rehabilitation Plan and to approve a program as a Rehabilitation Plan. The Insurance Company will work with the Employee, the Employer and the Employee's Physician and others, as appropriate, to perform the assessment, develop a Rehabilitation Plan, and discuss return to work opportunities.

The Rehabilitation Plan may, at the Insurance Company's discretion, allow for payment of the Employee's medical expense, education expense, moving expense, accommodation expense or family care expense while he or she participates in the program.

If an Employee fails to fully cooperate in all required phases of the Rehabilitation Plan and assessment without Good Cause, no Disability Benefits will be paid, and insurance will end.

**Spouse Rehabilitation Benefit**

While an Employee is Disabled, his or her Spouse may, at the option of the Insurance Company, be eligible to participate in a Spouse Rehabilitation Plan. To be eligible, the following conditions must be met:

1. the Employee must be continuously Disabled for 12 months;
2. his or her Spouse's earnings must be 60% or less than the Employee's Covered Earnings; and
3. his or her Spouse must be determined by the Insurance Company to be a suitable candidate for rehabilitation.

"Spouse," as used in this provision, means the Employee's lawful Spouse living with him or her on the date the Employee's Disability begins. The Spouse Rehabilitation Plan will end if the Employee's Spouse is no longer living with the Employee.

The Spouse's Rehabilitation Plan may include, at the Insurance Company's discretion, payment of the Spouse's education expense, reasonable job placement expenses and moving expenses. It may also include family care expenses, if necessary, for his or her Spouse to be retrained under the Rehabilitation Plan.

Disability Benefits will be reduced by 50% of his or her Spouse's earnings from participation in the Rehabilitation Plan. If his or her Spouse was working before the Spouse Rehabilitation Plan begins, Disability Benefits will be reduced by 50% of the increase in income that results from his or her Spouse's participation in the Spouse Rehabilitation Plan.

TL-007501.00

**Conversion Privilege for Disability Insurance Benefits**

If an Employee's insurance ends because employment with the Employer ends, or an Employee is laid off or on an uninsured leave of absence, he or she may be eligible for conversion insurance.

To be eligible, an Employee must have been insured for Disability Benefits and actively at work for at least 12 straight months. If the Employee makes application for conversion insurance within 90 days after insurance under this Policy ends, conversion insurance will be effective as of the date insurance under this Policy ends. If an Employee makes application more than 90 days after insurance under this Policy ends, the Insurance Company will require the Employee to provide satisfactory evidence of good health at his or her own expense. Conversion insurance will be effective on the date the Insurance Company agrees in writing to insure him or her. An Employee must apply for conversion insurance within 62 days after insurance ends.

The benefits of the conversion plan will be those benefits offered at the time an Employee applies. The premium will be based on the rates in effect for conversion plans at that time.

Conversion insurance is not available if any of the following conditions apply:
1.  the Employee is retired or age 70 or older;
2.  the Employee is not in Active Service because of Disability;
3.  the Policy is canceled for any reason;
4.  the Employee is no longer in a Class of Eligible Employees, but is still employed by the Employer.

TL-007504.00

### Cost of Living Adjustment (COLA) Benefit

Each year the Insurance Company will increase an Employee's Disability Benefit after he or she has been continuously Disabled for the COLA Benefit Waiting Period. The increase will be the amount shown in the Schedule of Benefits.

The increase will become effective on the COLA Adjustment Date and will be payable for the Maximum Period for COLA Benefits. This benefit does not apply to the Disability Minimum or Maximum Benefit. It does not apply to the formula used to determine Work Incentive Benefits, if any.

TL-005101

### Survivor Benefit

The Insurance Company will pay a Survivor Benefit if an Employee dies while Monthly Benefits are payable. The Employee must have been continuously Disabled before the first benefit is payable. These benefits will be payable for the Maximum Benefit Period for Survivor Benefits.

Benefits will be paid to the Employee's Spouse. If there is no Spouse, benefits will be paid in equal shares to the Employee's surviving Children. If there are no Spouse and no Children, benefits will be paid to the Employee's estate.

"Spouse" means an Employee's lawful spouse. "Children" means an Employee's unmarried children under age 26 who are chiefly dependent upon the Employee for support and maintenance. The term includes a stepchild living with the Employee at the time of his or her death.

TL-005107 (980008)

## TERMINATION OF DISABILITY BENEFITS

Benefits will end on the earliest of the following dates:
1.  the date the Employee earns from any occupation, more than the percentage of Indexed Earnings set forth in the definition of Disability applicable to him or her at that time;
2.  the date the Insurance Company determines he or she is not Disabled;
3.  the end of the Maximum Benefit Period;
4.  the date the Employee dies;
5.  the date the Employee refuses, without Good Cause, to fully cooperate in all required phases of the Rehabilitation Plan and assessment;
6.  the date the Employee is no longer receiving Appropriate Care;
7.  the date the Employee fails to cooperate with the Insurance Company in the administration of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.

Benefits may be resumed if the Employee begins to cooperate fully in the Rehabilitation Plan within 30 days of the date benefits terminated.

TL-007502.00

**Proof of Loss**
Written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, must be given to the Insurance Company within 90 days after the date of the loss for which a claim is made. If written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, is not given in that 90 day period, the claim will not be invalidated nor reduced if it is shown that it was given as soon as was reasonably possible. In any case, written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, must be given not more than one year after that 90 day period. If written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, is provided outside of these time limits, the claim will be denied. These time limits will not apply while the person making the claim lacks legal capacity.

Written proof, or proof by any other electronic/telephonic means authorized by the Insurance Company, that the loss continues must be furnished to the Insurance Company at intervals required by us. Within 30 days of a request, written proof of continued Disability and Appropriate Care by a Physician must be given to the Insurance Company.

**Time of Payment**
Disability Benefits will be paid at regular intervals of not less frequently than once a month. Any balance, unpaid at the end of any period for which the Insurance Company is liable, will be paid at that time.

**To Whom Payable**
Disability Benefits will be paid to the Employee. If any person to whom benefits are payable is a minor or, in the opinion of the Insurance Company, is not able to give a valid receipt, such payment will be made to his or her legal guardian. However, if no request for payment has been made by the legal guardian, the Insurance Company may, at its option, make payment to the person or institution appearing to have assumed custody and support.

If an Employee dies while any Disability Benefits remain unpaid, the Insurance Company may, at its option, make direct payment to any of the following living relatives of the Employee: spouse, mother, father, children, brothers or sisters; or to the executors or administrators of the Employee's estate. The Insurance Company may reduce the amount payable by any indebtedness due.

Payment in the manner described above will release the Insurance Company from all liability for any payment made.

**Physical Examination and Autopsy**
The Insurance Company, at its expense, will have the right to examine any person for whom a claim is pending as often as it may reasonably require. The Insurance Company may, at its expense, require an autopsy unless prohibited by law.

**Legal Actions**
No action at law or in equity may be brought to recover benefits under the Policy less than 60 days after written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, has been furnished as required by the Policy. No such action shall be brought more than 3 years after the time satisfactory proof of loss is required to be furnished.

**Time Limitations**
If any time limit stated in the Policy for giving notice of claim or proof of loss, or for bringing any action at law or in equity, is less than that permitted by the law of the state in which the Employee lives when the Policy is issued, then the time limit provided in the Policy is extended to agree with the minimum permitted by the law of that state.

## EXCLUSIONS

The Insurance Company will not pay any Disability Benefits for a Disability that results, directly or indirectly, from:

1.  suicide, attempted suicide, or self-inflicted injury while sane or insane.
2.  war or any act of war, whether or not declared.
3.  active participation in a riot.
4.  commission of a felony.
5.  the revocation, restriction or non-renewal of an Employee's license, permit or certification necessary to perform the duties of his or her occupation unless due solely to Injury or Sickness otherwise covered by the Policy.

In addition, the Insurance Company will not pay Disability Benefits for any period of Disability during which the Employee is incarcerated in a penal or corrections institution.

TL-007503.00

## CLAIM PROVISIONS

**Notice of Claim**
Written notice, or notice by any other electronic/telephonic means authorized by the Insurance Company, must be given to the Insurance Company within 31 days after a covered loss occurs or begins or as soon as reasonably possible. If written notice, or notice by any other electronic/telephonic means authorized by the Insurance Company, is not given in that time, the claim will not be invalidated or reduced if it is shown that notice was given as soon as was reasonably possible. Notice can be given at our home office in Philadelphia, Pennsylvania or to our agent. Notice should include the Employer's Name, the Policy Number and the claimant's name and address.

**Claim Forms**
When the Insurance Company receives notice of claim, the Insurance Company will send claim forms for filing proof of loss. If claim forms are not sent within 15 days after notice is received by the Insurance Company, the proof requirements will be met by submitting, within the time required under the "Proof of Loss" section, written proof, or proof by any other electronic/telephonic means authorized by the Insurance Company, of the nature and extent of the loss.

**Claimant Cooperation Provision**
Failure of a claimant to cooperate with the Insurance Company in the administration of the claim may result in termination of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.

**Insurance Data**
The Employer is required to cooperate with the Insurance Company in the review of claims and applications for coverage. Any information the Insurance Company provides in these areas is confidential and may not be used or released by the Employer if not permitted by applicable privacy laws.

**Physician/Patient Relationship**
The Insured will have the right to choose any Physician who is practicing legally. The Insurance Company will in no way disturb the Physician/patient relationship.

TL-004724

## ADMINISTRATIVE PROVISIONS

**Premiums**
The premiums for this Policy will be based on the rates currently in force, the plan and the amount of insurance in effect.

**Changes in Premium Rates**
The premium rates may be changed by the Insurance Company from time to time with at least 31 days advance written notice. No change in rates will be made until 36 months after the Policy Effective Date. An increase in rates will not be made more often than once in a 12 month period. However, the Insurance Company reserves the right to change the rates even during a period for which the rate is guaranteed if any of the following events take place.

1. The terms of the Policy change.
2. A division, subsidiary, affiliated company or eligible class is added or deleted from the Policy.
3. There is a change in the factors bearing on the risk assumed.
4. Any federal or state law or regulation is amended to the extent it affects the Insurance Company's benefit obligation.
5. The Insurance Company determines that the Employer has failed to promptly furnish any necessary information requested by the Insurance Company, or has failed to perform any other obligations in relation to the Policy.

If an increase or decrease in rates takes place on a date that is not a Premium Due Date, a pro rata adjustment will apply from the date of the change to the next Premium Due Date.

**Reporting Requirements**
The Employer must, upon request, give the Insurance Company any information required to determine who is insured, the amount of insurance in force and any other information needed to administer the plan of insurance.

**Payment of Premium**
The first premium is due on the Policy Effective Date. After that, premiums will be due monthly unless the Employer and the Insurance Company agree on some other method of premium payment.

If any premium is not paid when due, the plan will be canceled as of the Premium Due Date, except as provided in the Policy Grace Period section.

**Notice of Cancellation**
The Employer or the Insurance Company may cancel the Policy as of any Premium Due Date by giving 31 days advance written notice. If a premium is not paid when due, the Policy will automatically be canceled as of the Premium Due Date, except as provided in the Policy Grace Period section.

**Policy Grace Period**
A Policy Grace Period of 31 days will be granted for the payment of the required premiums under this Policy. This Policy will be in force during the Policy Grace Period. The Employer is liable to the Insurance Company for any unpaid premium for the time this Policy was in force.

**Grace Period for the Insured**
If the required premium is not paid on the Premium Due Date, there is a 31 day grace period after each premium due date after the first. If the required premium is not paid during the grace period, insurance will end on the last day for which premium was paid.

**Reinstatement of Insurance**
An Employee's insurance may be reinstated if it ends because the Employee is on an unpaid leave of absence.

An Employee's insurance may be reinstated only if reinstatement occurs within 12 weeks from the date insurance ends due to an Employer approved unpaid leave of absence or must be returning from military service pursuant to the Uniformed Services Employment Act of 1994 (USERRA). For insurance to be reinstated the following conditions must be met.
1.   An Employee must be in a Class of Eligible Employees.
2.   The required premium must be paid.
3.   A written request for reinstatement must be received by the Insurance Company within 31 days from the date an Employee returns to Active Service.

Reinstated insurance will be effective on the date the Employee returns to Active Service. If an Employee did not fully satisfy the Eligibility Waiting Period or the Pre-Existing Condition Limitation (if any) before insurance ended due to an unpaid leave of absence, credit will be given for any time that was satisfied.

TL-004720

## GENERAL PROVISIONS

**Entire Contract**
The entire contract will be made up of the Policy, the application of the Employer, a copy of which is attached to the Policy, and the applications, if any, of the Insureds.

**Incontestability**
All statements made by the Employer or by an Insured are representations not warranties. No statement will be used to deny or reduce benefits or as a defense to a claim, unless a copy of the instrument containing the statement has been furnished to the claimant. In the event of death or legal incapacity, the beneficiary or representative must receive the copy.

After two years from an Insured's effective date of insurance, or from the effective date of any added or increased benefits, no such statement will cause insurance to be contested except for fraud or eligibility for coverage.

**Misstatement of Age**
If an Insured's age has been misstated, the Insurance Company will adjust all benefits to the amounts that would have been purchased for the correct age.

**Policy Changes**
No change in the Policy will be valid until approved by an executive officer of the Insurance Company. This approval must be endorsed on, or attached to, the Policy. No agent may change the Policy or waive any of its provisions.

**Workers' Compensation Insurance**
The Policy is not in lieu of and does not affect any requirements for insurance under any Workers' Compensation Insurance Law.

**Certificates**
A certificate of insurance will be delivered to the Employer for delivery to Insureds. Each certificate will list the benefits, conditions and limits of the Policy. It will state to whom benefits will be paid.

**Assignment of Benefits**
The Insurance Company will not be affected by the assignment of an Insured's certificate until the original assignment or a certified copy of the assignment is filed with the Insurance Company. The Insurance Company will not be responsible for the validity or sufficiency of an assignment. An assignment of benefits will operate so long as the assignment remains in force provided insurance under the Policy is in effect. This insurance may not be levied on, attached, garnisheed, or otherwise taken for a person's debts. This prohibition does not apply where contrary to law.

**Clerical Error**
A person's insurance will not be affected by error or delay in keeping records of insurance under the Policy. If such an error is found, the premium will be adjusted fairly.

**Agency**
The Employer and Plan Administrator are agents of the Employee for transactions relating to insurance under the Policy. The Insurance Company is not liable for any of their acts or omissions.

TL-004726

## DEFINITIONS

Please note, certain words used in this document have specific meanings. These terms will be capitalized throughout this document. The definition of any word, if not defined in the text where it is used, may be found either in this Definitions section or in the Schedule of Benefits.

**Active Service**
An employee is in Active Service on a day which is one of the Employer's scheduled work days if either of the following conditions are met.

1.  The Employee is performing his or her regular occupation for the Employer on a full-time basis. He or she must be working at one of the Employer's usual places of business or at some location to which the employer's business requires an Employee to travel.
2.  The day is a scheduled holiday or vacation day and the Employee was performing his or her regular occupation on the preceding scheduled work day.

An Employee is in Active Service on a day which is not one of the Employer's scheduled work days only if he or she was in Active Service on the preceding scheduled work day.

**Annual Enrollment Period**
The period in each calendar year when an eligible Employee may enroll for or change benefit elections under the Policy. This period must be agreed upon by the Employer and the Insurance Company.

**Appropriate Care**
Appropriate Care means the determination of an accurate and medically supported diagnosis of the Employee's Disability by a Physician, or a plan established by a Physician of ongoing medical treatment and care of the Disability that conforms to generally accepted medical standards, including frequency of treatment and care.

**Consumer Price Index (CPI-W)**
The Consumer Price Index for Urban Wage Earners and Clerical Workers published by the U.S. Department of Labor. If the index is discontinued or changed, another nationally published index that is comparable to the CPI-W will be used.

38

**Disability Earnings**
Any wage or salary for any work performed for any employer during the Employee's Disability, including commissions, bonus, overtime pay or other extra compensation.

**Employee**
For eligibility purposes, an Employee is an employee of the Employer in one of the "Classes of Eligible Employees." Otherwise, Employee means an employee of the Employer who is insured under the Policy.

**Employer**
The Employer who has subscribed to the Policyholder and for the benefit of whose Employees this policy has been issued. The Employer, named as the Subscriber on the front of this Policy, includes any affiliates or subsidiaries covered under the Policy. The Employer is acting as an agent of the Insured for transactions relating to this insurance. The actions of the Employer shall not be considered the actions of the Insurance Company.

**Full-time**
Full-time means the number of hours set by the Employer as a regular work day for Employees in the Employee's eligibility class.

**Good Cause**
A medical reason preventing participation in the Rehabilitation Plan. Satisfactory proof of Good Cause must be provided to the Insurance Company.

**Indexed Earnings**
For the first 12 months Monthly Benefits are payable, Indexed Earnings will be equal to Covered Earnings. After 12 Monthly Benefits are payable, Indexed Earnings will be an Employee's Covered Earnings plus an increase applied on each anniversary of the date Monthly Benefits became payable. The amount of each increase will be the lesser of:
1.   10% of the Employee's Indexed Earnings during the preceding year of Disability; or
2.   the rate of increase in the Consumer Price Index (CPI-W) during the preceding calendar year.

**Injury**
Any accidental loss or bodily harm which results directly and independently of all other causes from an Accident.

**Insurability Requirement**
An eligible person will satisfy the Insurability Requirement for an amount of coverage on the day the Insurance Company agrees in writing to accept him or her as insured for that amount. To determine a person's acceptability for coverage, the Insurance Company will require evidence of good health and may require it be provided at the Employee's expense.

**Insurance Company**
The Insurance Company underwriting the Policy is named on the Policy cover page.

**Insured**
A person who is eligible for insurance under the Policy, for whom insurance is elected, the required premium is paid and coverage is in force under the Policy.

**Life Status Change**

A Life Status Change is an event recognized by the Employer's Flexible Benefits Plan as qualifying an Employee to make changes in benefit selections at a time other than an Annual Enrollment Period.

If there is no Employer sponsored Flexible Benefits Plan, or if it is no longer in effect, the following events are Life Status Changes.

1.  Marriage
2.  Divorce, annulment or legal separation
3.  Birth or adoption of a child
4.  Death of a spouse
5.  Termination of a spouse's employment
6.  A change in the benefit plan available to the Employee's spouse
7.  A change in the Employee's or spouse's employment status that affects either's eligibility for benefits

**Physician**

Physician means a licensed doctor practicing within the scope of his or her license and rendering care and treatment to an Insured that is appropriate for the condition and locality. The term does not include an Employee, an Employee's spouse, the immediate family (including parents, children, siblings or spouses of any of the foregoing, whether the relationship derives from blood or marriage), of an Employee or spouse, or a person living in an Employee's household.

**Prior Plan**

The Prior Plan refers to the plan of insurance providing similar benefits sponsored by the Employer in effect directly prior to the Policy Effective Date. A Prior Plan will include the plan of a company in effect on the day prior to that company's addition to this Policy after the Policy Effective Date.

**Regular Occupation**

The occupation the Employee routinely performs at the time the Disability begins. In evaluating the Disability, the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy. It is not work tasks that are performed for a specific employer or at a specific location.

**Rehabilitation Plan**

A written plan designed to enable the Employee to return to work. The Rehabilitation Plan will consist of one or more of the following phases:

1.  rehabilitation, under which the Insurance Company may provide, arrange or authorize educational, vocational or physical rehabilitation or other appropriate services;
2.  work, which may include modified work and work on a part-time basis.

**Sickness**

Any physical or mental illness.

TL-007500.00

## SCHEDULE OF AFFILIATES

The following affiliates are covered under the Policy as of January 1, 2004.

Affiliate Name

Assisted Living/ MegaCare Nursing Homes

Center for Hospice Care

Center State Management Corp/ Ocean GYN-NOB Assoc.

Central Jersey Behavioral Health

Clara Maass Continuing Care Center- Belleville

Clara Maass Continuing Care Center- Kearny

Clara Maass Continuing Care Center- West Hudson

Clara Maass Medical Center

Community Medical Assoc/ Ocean GYN-NOB Assoc

Community Medical Center

Country Manor/ MegaCare Nursing Homes

EMTAC

Irvington General Hospital

KareMed

Kensington Manor/ MegaCare Nursing Homes

Kimball Medical Center

Livingston Service Corp/ St. Barnabas Medical Ctr

Major Investigations/ St. Barnabas Medical Ctr

Medical Center Staffing Services

MegaCare Nursing (Cornell Hall)

MegaCare Nursing (Ashbrook)

MegaCare Nursing (Greenbrook)

MegaCare Nursing (Llanfair)

Monmouth Medical Center

41

Monmouth Faculty Practice/ Medical Center

Newark Beth Israel Medical Center

Physicians Practice Svc/ Center State Collections

Saint Barnabas Medical Center

SB Development Foundation/ Medical Center

SBC Management Corp/St. Barnabas Health Care Sys

Saint Barnabas Facilities Mgmt/Medical Center

SB Outpatient Centers/ Ambulatory Care Center

Saint Barnabas Behavioral Health/Central Jersey BH

Systems Business Office

Union Hospital

The Marathon Group

Monmouth Health Foundation/ Health Management

Monmouth Health Management

TL-004776

B

*Shunda Stevenson*
*CIGNA Group Insurance*
629
Disability Management Solutions
P.O. Box 709015
Dallas, TX 75370-9015

Phone: 800-352-0611 ext. 4726
Fax: 860-731-2907
www.mycigna.com



**CIGNA Group Insurance**
Life · Accident · Disability

MRS. LISA MARINO
182 OAKWOOD AVE
WEST LONG BRANCH, NJ 07764

June 29, 2015

| | |
|---|---|
| Name: | LISA MARINO |
| Incident Number: | 2487057 |
| Plan/Policy Number: | FLK0980008 |
| Plan/Policy Holder: | SAINT BARNABAS HEALTH CARE SYSTEM |
| Underwriting Company: | Life Insurance Company of North America |

DEAR MRS. MARINO,

This letter is about your Long Term Disability claim. We have separated this letter into subject headings for your ease of reference.

## Will You Receive/Continue to Receive Disability Benefits?

After completing our review of your claim, we are unable to consider you disabled beyond June 25, 2015.

To prevent a potential financial hardship, you will receive a check payable thru July 25, 2015 in the amount of $1281.92 under separate cover.

## What Provisions of the Disability Policy Apply to the Decision on Your Claim?

According to your Employer's Policy:

*"The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:*
*1) unable to perform the material duties of his or her Regular Occupation; and*
*2) unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.*

*After Disability Benefits have been paid for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:*
*1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified for based on education, training, or experience, and*
*2. unable to earn 60% or more of his or her Indexed Earnings."*

## What Information Was Reviewed?

We recently completed a review of the information on file. When reviewing your claim for disability benefits, all information on file was considered. This included, but was not limited to the following:
--Disability Questionnaire received dated 05/27/15

CIGNA Group Insurance is a registered service mark of CIGNA Intellectual Property, Inc., licensed for use by insurance company subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York and Connecticut General Life Insurance Company. Products and services are provided by these insurance company subsidiaries and not by CIGNA Corporation.

June 29, 2015
Page 2

--Medical Records from Dr. Falco received 06/10/15
--Physical Abilities Assessment Form completed by Dr. Falco dated 06/10/15
--Medical Records from Dr. Gilson received 06/19/15

## Who Reviewed Your Claim?

--Claims Manager
--Senior Claims Manager
--Nurse Case Manager
--Vocational Rehabilitation Counselor

## How Was the Claim Decision Reached?

In evaluating your claim, we reviewed all relevant claim information from the inception of your claim to the present time. The claim file indicated that you had a history of surgical resection of a left acoustic neuroma. The medical records indicated that you had chronic vestipulopathy, headaches, dizziness, vision loss, and left ear ringing.

The claim's past documentation was reviewed to familiarize ourselves with your extensive medical history and subsequent treatment. However, to determine your current functionality and whether benefits continued to be warranted at this time, we concentrated on your current treatment and reported abilities to properly assess your claim.

We received a completed disability questionnaire form from you on May 28, 2015. We sent a request for the following information to your doctors.

--Complete copies of treatment notes from January 01, 2014 to the present
--Test results/findings
--Restrictions and limitations that prevent you from returning to work
--Physical Abilities Assessment Form

On the Disability Questionnaire you indicated that the primary physical conditions preventing you from working are vertigo, passing out, migraines with partial loss of sight, dizziness with feeling of falling forward, balance issues, ringing in your ears, confusion and vomiting.

We received medical records from Dr. Falco, who is your Primary Care Physician. An office visit note dated March 02, 2015, indicated that you were following up for disability. It was indicated that you had a history of Neurological systems, your gait was pretty good, you could stand on one foot, and you walk tentatively.

An office visit note from Dr. Falco dated June 03, 20154, indicated that your right vocal cord was paralyzed. It was indicated that your left vocal cord was ok.

Dr. Falco completed a physical abilities assessment form dated June 06, 2015, which he indicated that you could perform the following activities in an eight hour work day:

**Occasional**-sit, stand, walk, reaching overhead, reaching desk level, reaching below waist, lifting 10 pounds, carrying 10 pounds very limited, pushing 10 pounds limited, pulling 10 pounds, climbing regulars stairs, balancing severely limited, kneeling, crouching, crawling

Frequent-fine manipulation right and left, simple grasp right and left, firm grasp right and left, unless optical migraines

It was indicated that you were deaf in your right ear, but your left ear was ok secondary to Acoustic Neuroma surgery.

We received medical records from Dr. Gilson, who is your Neurologist dated July 10, 2014. It was indicated that you were following up for migraines, and chronic cervical spasm. It was indicated that you had a benign neoplasm of cerebral meninges, with removal of the left sided lesion resulted in a lot of ongoing symptoms. Medical records did not show that you had any recent visits with Dr. Gilson since July of 2014.

June 29, 2015
Page 3

To access your vocational capabilities your file was referred to a certified rehabilitation counselor who reviewed a summary of your training, education, and experience as provided by you and your employer along with the physical abilities assessment form completed by Dr. Falco. The Transferrable Skills Analysis considers your skills that would transfer to other occupations within the limitations and restrictions provided as well as your education, work history, gained abilities, and wage requirement. These occupations include, but may not be limited to:

DOT CODE OCCUPATION
237.367-022-Information Clerk-sedentary
205.367-062- Referral Clerk, Temporary Help Agency-sedentary

The occupations listed above were found to fit the given limitations and restrictions provided by the Transferrable Skills Analysis; we have determined that you are capable of returning to work in the above occupations.

Social Security Disability Insurance was awarded in September 09 and was considered in the claim review. We confirmed there was not a reassessment by the Social Security Administration performed during the last twelve months. As such, we were unable to request current Social Security Administration documentation with the required specificity to support a direct Social Security Administration records request for current documentation per Social Security Administration's regulations, manuals, and guidelines. Information in our file is more recent than what the Social Security Administration had to consider at the time of its decision.

At this time your claim has been closed and no further benefits are payable.

**What If You Don't Agree With The Claim Decision?**

If you disagree with our determination and wish to have it reviewed, please follow the steps described below.

Based on the information provided by your Employer, your claim is governed by the Employee Retirement Income Security Act of 1974, Public Law 93-406 (ERISA). ERISA requires that you go through the Company's administrative appeal review process prior to pursuing any legal action challenging our claim determination.

Here's how to submit your administrative appeal review request:

-- Submit your appeal letter to us within 180 days of your receipt of this letter.
-- Your appeal letter should be sent to the Life Insurance Company of North America representative signing this letter to the address noted on the letterhead.
-- Your appeal letter may include written comments as well as any new information you may have.
-- You may also submit additional information. Additional information may include, but is not limited to: medical records from your doctor and/or hospital, test result reports, therapy notes, etc. These medical records should cover the period of January 1, 2015 through present.
-- You may also wish to have your doctor(s) provide some or all of the following:
[Medical Consultations, Hospitalizations, Cognitive Testing]

You have the right to bring a legal action for benefits under the Employee Retirement Income Security Act of 1974 (ERISA) section 502(a) following an adverse benefit determination on appeal.

Nothing contained in this letter should be construed as a waiver of any rights or defenses under the policy. This determination has been made in good faith and without prejudice under the terms and conditions of the contract, whether or not specifically mentioned herein.

Please be aware that you are entitled to receive, upon request and free of charge, information relevant to your claim for benefits.

June 29, 2015
Page 4

Please contact our office at 800-352-0611 ext. 4726 should you have any questions.

Sincerely,

*Shunda Stevenson*

Shunda Stevenson
Disability Claim Manager

C

# David Falco, M.D.

280 NORWOOD AVENUE
WEST LONG BRANCH, NJ 07764
Telephone (732) 222-4653
Fax (732) 222-2524

July 7, 2015

RE: Lisa Marino

To Whom It May Concern,

Lisa Marino is currently under my care status post removal of a left acoustic neuroma in 2006. Since her surgery she unfortunately has had no improvement in her post- operative symptoms which include headaches, dizziness, tinnitus in the left ear, vertigo, disruption or balance, syncope, and visual disturbances. She is now unable to drive on a road greater than 2 lanes, and her drive must be less than a mile.

Mrs. Marino is being followed by a neurologist for the above symptoms and it appears her condition will not improve. Mrs. Marino struggles in a busy environment as she is unable to process sound directions leading her to become disoriented. The disorientation has lead to full blown panic and anxiety episodes.

In the physical ability assessment form provided by you her insurance company, I was unable to adequately express the physical limitations Mrs. Marino's disability plays in her everyday life. I do not foresee her as being able to assimilate into any work environment. I have again requested she return to Dr. Gilson for further evaluation in the hopes that there may be new types of therapy to assist her.

D

# NEUROLOGY SPECIALISTS of Monmouth County, NJ

107 Monmouth Road
West Long Branch, NJ 07764

Paul Gennaro, M.D.
Noah R. Gilson, M.D.
F. Bernard Ponce, M.D.
Neil R. Holland, M.D.
Joshua Mendelson, MD
Matthew J. Davis, MD

Diplomats, American Board
of Psychiatry and Neurology
in NEUROLOGY

732-935-1850

Fax: 732-544-0494

www.neurologyspecialists.org

2015-07-08

Re: Lisa Marino

To Whom It May Concern:

The above-mentioned individual remains permanently disabled. Please refer to my letter of May 7, 2010. My impression and recommendation remain unchanged from that time. The patient has been clinically unchanged since that date. If you have any further questions concerning her neurologic status feel free to call me.

The patient returns for yearly follow-ups which is more than adequate frequency to determine her ongoing permanent disability status.

Sincerely

Noah Gilson M.D.

E

F

IN THE MATTER OF

**LIFE INSURANCE COMPANY OF NORTH AMERICA, CONNECTICUT GENERAL LIFE INSURANCE COMPANY, AND CIGNA HEALTH AND LIFE INSURANCE COMPANY (FORMERLY KNOW AS ALTA HEALTH AND LIFE INSURANCE COMPANY)**

Philadelphia, Pennsylvania
NAIC # 65498

Bloomfield, Connecticut
NAIC # 67369, 62308

**REGULATORY SETTLEMENT AGREEMENT**

**TARGETED MARKET CONDUCT EXAMINATION
DISABILITY INCOME INSURANCE CLAIM HANDLING PRACTICES**

This Regulatory Settlement Agreement ("Agreement") is entered into as of this 13th day of May, 2013 (the "Effective Date"), by and among the Life Insurance Company of North America ("LINA"), Connecticut General Life Insurance Company, and Cigna Health and Life Insurance Company (formerly known as Alta Health and Life Insurance Company) (the "Company" or "Companies"), the California Department of Insurance, the Connecticut Insurance Department, the Maine Bureau of Insurance, the Massachusetts Division of Insurance, the Pennsylvania Insurance Department (the "Monitoring States") and the insurance regulators who have executed the form of "Participating State Adoption" set forth at Exhibit A (along with the Monitoring States, the "Participating States").

**A.    Recitals**

1.    At all relevant times the Companies have been licensed insurance companies domiciled in the Commonwealth of Pennsylvania and State of Connecticut and authorized to write life and health insurance in the Participating States.  The Companies are wholly owned subsidiaries of CG Corporation, a Connecticut holding company. CG Corporation is in turn a wholly owned subsidiary of CIGNA Holdings, Inc., a Delaware holding company.  The ultimate parent of the Companies is CIGNA, Corp., a Delaware holding company (collectively with its member insurers, the "CIGNA Companies").  The Companies are the members of the CIGNA Companies writing long term disability income insurance ("LTD") policies in the Participating States.  The Companies offer only group LTD policies in the Participating States.  They do not offer individual LTD policies in the Participating States.

2.    On September 15, 2009, the Maine Superintendent of Insurance and the Massachusetts Commissioner of Insurance initiated targeted market conduct examinations (the

1

"New England Examinations") of the CIGNA Companies writing disability income insurance regarding their claim handling practices in Maine and Massachusetts. Among other things, the Examinations investigated whether the Companies' claim handling practices conformed with the standards reflected in the National Association of Insurance Commissioners ("NAIC") *Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance Model Act* (1972), *NAIC Claims Settlement Practices Model Act* (1990) (together, the "Model Act"), and the Maine and Massachusetts unfair insurance trade practices acts, pursuant to the procedures established by the *NAIC Market Regulation Handbook* (the "Handbook"). The examiners also used the terms of the Multistate Regulatory Settlement Agreement entered into by forty-nine of the United States insurance regulatory jurisdictions and the United States Department of Labor with the principal insurers of the Unum Group in 2005 ("Unum RSA") as a benchmark for their review. The two examinations were conducted simultaneously, on a coordinated basis by the same examiners pursuant to the Model Act, relevant Maine and Massachusetts statutes and regulations, and the Unum RSA.

3.      Examination reports regarding the New England Examinations are being released concurrently with this Agreement. Each of those examination reports contemplates the execution of this Agreement.

4.      As a result of the New England Examinations, the Maine Superintendent of Insurance and the Massachusetts Commissioner of Insurance engaged in discussions with the Companies with respect to regulatory concerns raised by the examiners and a plan of corrective action by the Companies to address those concerns.

5.      In November 2011 examiners briefed the Connecticut Insurance Commissioner and the Pennsylvania Insurance Commissioner regarding the regulatory concerns raised by the New England Examinations.

6.      On August 18, 2009 the California Department of Insurance and LINA entered into a Stipulation and Waiver Agreement addressing the findings of a market conduct examination of LINA's LTD claims handling practices as of June 20, 2006 (the "2006 California Examination"). On October 1, 2010 the California Commissioner of Insurance initiated a follow-up examination of LINA (the "2010 California Re-Examination") to discover, in general, if the Companies' group LTD claims handling practices conform to the contractual obligations of its policy forms, the California Insurance Code, the California Code of Regulations, and case law. An examination report regarding the 2010 California Re-Examination was adopted by the California Commissioner of Insurance on June 4, 2012. (Collectively, the New England Examination, the 2006 California Examination, and the 2010 California Re-Examination are referred to as the "Examinations").

2

7.    In light of the regulatory concerns raised by the Examinations, the Monitoring States entered into discussions with the Companies regarding resolution of the regulatory concerns raised and the establishment of a uniform plan of corrective action.

8.    After discussion, the Companies agreed to the plan of corrective action set forth in this Agreement, the establishment of a remediation program for the redetermination of certain LTD claims, and the payment of certain fines.  The terms and conditions of this Agreement will apply in all of the Participating States.

9.    The plan of corrective action addresses a number of regulatory concerns arising from the Examinations.  It seeks to accomplish the following:

a.  Enhance claim procedures to improve the claim handling process and benefit current and future insureds as described in this Agreement, including Exhibits B, C, and D;

b.  Monitor the Companies' implementation of these claim handling procedures by means of (i) regular meetings between a management team designated by the Companies and Monitoring States (as defined in paragraph B.5, below) and (ii) a follow-up examination; and,

c.  Establish a Remediation Program in which, as described more fully in Exhibit F, the Companies' enhanced claim procedures will be applied to certain previously denied or adversely terminated claims.

10.    This Agreement sets forth (i) the plan of corrective action, (ii) provisions concerning the enforcement of the Companies' compliance with the plan of corrective action, (iii) the Remediation Program, and (iv) other miscellaneous provisions of this Agreement.

11.    Location of Definitions. (*paragraph* at *page number*)

"2006 California Examination" ........A.6 at 2
"2010 California Re-Examination"...A.6 at 2
"Agreement" ...........................Preamble at 1
"CIGNA Companies" .......................A.1 at 1
"Company" or "Companies"....Preamble at 1
"Effective Date".......................Preamble at 1
"Examinations" .................................A.6 at 2
"FCE"............................................. B.1.c at 4
"Handbook" .......................................A.2 at 2
"IME".............................................. B.1.c at 4

"LINA" ...................................Preamble at 1
"LTD" .................................................A.1 at 1
"Medical Director".........................Ex. D at i
"Model Act"........................................A.2 at 2
"Monitoring States" .................Preamble at 1
"NAIC" ..............................................A.2 at 2
"New England Examinations"..........A.2 at 2
"Participating States"..............Preamble at 1
"Plan"....................................................B at 4
"Professional" .................................B.1.f at 5

3

"Remediation Period" .....................Ex. F at i      "SSDI" ...........................................B.1.a at 4

"Remediation Program"....................B.4 at 6         "Unum RSA" ....................................A.2 at 2

"SSA"............................................. Ex. B at i

The definitions contained in this Agreement shall apply equally to the exhibits to this Agreement.  Where a term is expressly defined in an exhibit, the definition in that exhibit shall control.

## B.    Plan of Corrective Action (the "Plan")

The procedures described below reflect the Companies' and the Participating States' view of best practices for adjusting group LTD claims and do not necessarily reflect examiner findings that the Companies have actually engaged in any of the conduct which those procedures are designed to avoid.

   1.    Enhanced Claim Procedures

The Companies are committed to ensuring full and fair evaluation of insureds' eligibility for and entitlement to disability benefits.  A cornerstone of those evaluations is the Companies' commitment to gather and consider information that is relevant to the claim determination, as set forth below.

   a.   *Procedures regarding the weight to be given to awards of Social Security Disability Income ("SSDI") benefits.*  Guidelines, in the form attached as Exhibit B, regarding the weight to be given to the awards of SSDI benefits have been adopted by the Companies, circulated to all personnel involved in the determination of LTD claims, and will be included in the future training of such personnel.

   b.   *Enhanced procedures regarding the gathering of medical information and the documentation of conclusions.*  Enhanced procedures, in the form attached as Exhibit C, regarding the gathering of medical information, analysis of such information, and the documentation of claim personnel's conclusions have been adopted by the Companies, circulated to all personnel involved in the determination of LTD claims, and will be included in the future training of such personnel.

   c.   *Guidelines for Use of External Medical Resources.*  Guidelines, in the form attached as Exhibit D, clarifying the use of external medical resources -- including, as appropriate, an Independent Medical Evaluation ("IME") or a Functional Capacity Evaluation ("FCE") -- in making a disability analysis have been adopted by the Companies, circulated to all personnel involved in the determination of LTD claims, and will be included in the future training of such personnel.

4

d. *Ongoing objectives*. The Companies' claim procedures shall include the following ongoing objectives:

    i. Focus on policies and procedures relating to medical and related evidence, as specifically described in this Agreement, including <u>Exhibits B, C, and D</u>.

    ii. Clear and express notice to claimants of the information to be provided by the claimants and the information to be collected by the Companies. If a file is determined to lack sufficient information, claim handling personnel will take reasonable steps to work with the claimant to identify and obtain such information in accordance with appropriate procedures established for such purposes.

The Companies shall ensure that their policies and procedures are consistent with the foregoing objectives. These objectives shall constitute criteria by which the Companies' claim handling performance shall be evaluated during the course of ongoing monitoring (discussed more fully in paragraphs B.5 and B.7 below) and during the follow-up re-examination (discussed more fully in paragraph C.2 below).

e. *Selection of Evaluation Personnel*. The Companies affirm and will continue their existing practice of selecting individuals to conduct IMEs or FCEs through an outside vendor, based solely on the basis of objective, professional criteria, and without regard to the results of previous IMEs or FCEs conducted by such individuals.

f. *Professional Certification*. The Companies affirm and shall continue their existing practice of requiring each clinical, vocational, and medical professional (a "Professional") employed by the Companies to (a) execute the "Statement Regarding Professional Conduct", found at <u>Exhibit E</u>, which includes a commitment to provide fair and reasonable evaluations concerning all available medical, clinical, and/or vocational evidence, both objective and subjective, bearing on impairment; and (b) certify that he or she has reviewed all medical or vocation information bearing on impairment that has been provided by the Companies to that Professional for review prior to issuing his or her opinion where such opinion will be used by the Companies in making any occupational or adverse liability determination as to a claimant's impairments.

g. *Providing Medical, Clinical, and/or Vocational Evidence*. The Companies affirm and shall continue their existing process that claim personnel, in soliciting evaluations of claimant impairment by Professionals (employed by the Companies or otherwise),

shall provide to each such Professional all available medical, clinical, and/or vocational evidence in the Disability Claim File (defined below at paragraph B.8), both objective and subjective, concerning impairment.

2.   <u>Affirmations</u>.  The Companies affirm that: (i) the Companies' processes prohibit attempting to influence in-house physicians or an IME or FCE in connection with such Professional's opinion concerning the medical evidence or medical condition relating to a claimant; (ii) the Companies do not evaluate claim personnel for promotion, retention, or any other purpose on the basis of any claim outcome (or, aside from productivity considerations, any number of claim outcomes); and, (iii) the Companies do not consider any claim outcome (or, aside from productivity considerations, any number of claim outcomes) in determining any component of compensation for claim personnel.  The Companies further affirm that they will not change any of these processes except in consultation with the Monitoring States.

3.   <u>Training</u>.  The Companies' claim personnel shall be provided appropriate training designed to educate them on the responsibilities arising from the changes included in paragraph B.1 as well as the objectives outlined in paragraph B.1.d of this Agreement.  Emphasis in such training shall be placed on concerns raised in the Examinations and the corrective measures set forth in this Agreement.  This training will include specific instruction on recognizing the special function that medical professionals perform in assessing medical information concerning claimants.  Furthermore, the training will confirm the continuing force of the Companies' processes affirmed in paragraph B.2.

4.   <u>Remediation Program</u>.  The Companies shall conduct a Remediation Program ("Remediation Program") in which, as described more fully in <u>Exhibit F</u>, the Companies enhanced claim procedures as set forth in this Agreement, will be applied to certain claims denied during the Remediation Period (defined in <u>Exhibit F</u>).

5.   <u>Monitoring of Compliance</u>.  The Monitoring States, in cooperation with the Participating States, shall monitor compliance with this Agreement and the Remediation Program and shall apprise other Participating States of the results of such monitoring as may be appropriate.  Such monitoring will include review of randomly sampled Disability Claim Files (defined below in paragraph B.8) denied, adversely terminated, and/or appealed on or after January 1, 2013 for claimants residing in the Participating States.  The purpose of monitoring is to review claims handling on a going forward basis and to establish productive dialogue between the Monitoring States and the Companies in preparation for re-examination (see paragraph C.2. below).  Accordingly, though corrective action may be required, no sanction will be imposed by the Participating States should monitoring disclose any claims that may have been erroneously handled.

6.    Quality Assessment Team.  For purposes of monitoring the implementation of the provisions of this Agreement, the Companies shall establish an internal Disability Claim Quality Assessment Team, which will consist of ten full-time dedicated employees, with an average experience level of eight years in the disability insurance industry.  The Companies' Policies and Procedures Manager will serve as the primary lead for the team, handling all oversight and project-related functions.  This team shall be in effect throughout the duration of the ongoing Quarterly Monitoring, as described in paragraph B.7 below.

A Management Advisory Group will also be established to provide additional support and direction to the Disability Claim Quality Assessment Team on topics ranging from claim specific scenarios to more global topics such as ensuring if applicable policies and procedures and/or Training materials should be modified.  The Management Advisory Group will include the following representatives of the Companies: VP of Disability Operations; Group Claims Counsel; Director, Total Quality Management; and Director, Policies and Procedures.

7.    Quarterly Monitoring.  For purposes of discussing the results of the Companies' internal Disability Claim Quality Assessment (described in paragraph B.6), the results of the random sampling provided for in paragraph B.5, the Remediation Program, and the Companies' compliance with this Agreement, the Monitoring States, or their designees, shall meet with the Companies' Management Advisory Group on a quarterly basis beginning on a date not earlier than sixty (60) days after the Effective Date and continuing through the commencement of the re-examination described in paragraph C.2. The Companies will provide to the Monitoring States a consolidated report of reassessed claims pursuant to the Remediation Program and any remedial action taken to determine and pay additional benefits where due, based on the application of the enhanced claim procedures set forth in this Agreement. The Companies will also consolidate the findings of the Disability Claims Quality Assessment Team into a report which will be delivered to the Monitoring States monthly.  Any comments or observations from the Monitoring States regarding these findings will be furnished to the Companies in writing monthly.  All findings, actions, and outcomes will be recorded and tracked by the Companies.  A summary statement of each monthly review period will be provided to the Monitoring States in writing prior to each meeting.  These meetings will be conducted in person -- though Monitoring States may, in their sole discretion, elect to participate telephonically -- to review the previous quarter's findings and discuss the overall direction and progress of the Companies' compliance with the terms of this Agreement.

8.    Disability Claim Files.  A disability claim file shall include all documents relating to a claim history and/or decision, including but not limited to correspondence, medical records, vocational records, forms, internal memoranda and internal communications (including e-mail communications), and copies of the documentation and written explanation contemplated under paragraphs B.1.a and B.1.c above, which shall be maintained in the claim file either in a paper file or in electronic form.

### C.      Other Provisions

1.      This Agreement shall be governed by and interpreted according to the laws of the Commonwealth of Pennsylvania, excluding its conflict of laws provisions.

2.      The Monitoring States will conduct a re-examination of the issues addressed by this Agreement twenty-four months after the Effective Date, or at such earlier date as may be agreed upon by the Companies and the Monitoring States.  The Monitoring States will make all reasonable efforts to complete such re-examination within six months of its commencement. The re-examination will review the Companies' LTD claims handling practices in the Participating States for compliance with this Agreement. This re-examination shall be conducted in accordance with the National Association of Insurance Commissioners' Market Regulation Handbook, Volume 1.  The Participating States shall not conduct independent market conduct examinations of the Companies' LTD claim practices until after the Monitoring States complete such re-examination.  Any claim files examined by the Monitoring States in connection with the re-examination of the Companies described in this Paragraph shall not be the subject of any future market conduct examinations of the Companies by any of the Participating States.

3.      The reasonable costs of the Monitoring States for outside services incurred in monitoring the Companies' compliance with this Agreement, reviewing the Companies' conduct of the Remediation Program, and in conducting the re-examination contemplated by paragraph C.2 shall be paid by the Companies.  The Companies will also pay each of the five Monitoring States a fee of $150,000, payable in two equal annual installments; one within fifteen (15) days of the Effective Date and the second on the first anniversary of the Effective Date.

4.      This Agreement shall remain effective until the completion of the re-examination referenced in paragraph C.2 above.  Except as set forth in paragraph C.5 below, this Agreement and its provisions terminate for all purposes pursuant to this paragraph C.4.

5.      Notwithstanding the termination of this Agreement to the extent provided in accordance with paragraph C.4 above, this Agreement shall survive as to the following provisions, which also individually survive: paragraphs B.1.a through B.1.g (inclusive); paragraph B.2; and paragraph B.8 (insofar as it describes the content of a Disability Claim File.)

6.      Neither this Agreement, the Remediation Program, nor any related negotiations, statements or court proceedings shall be offered by the Companies or the Participating States as evidence of or an admission, denial or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including but not limited to the Companies; as a waiver by the Companies of any applicable defenses, including without limitation any applicable statute of

limitation or statute of frauds; or as a waiver by the Commissioner of any regulatory authority regarding the matters addressed in the Examination.

7.      This Agreement does not constitute an admission of liability, violation, or wrongdoing by the Companies and the Companies expressly deny that any of their actions or alleged actions were knowingly committed or represented a pattern and/or business practice that would violate the insurance unfair trade practice laws, claims settlement laws, or any other applicable statutes or regulations of any of the Participating States.

8.      This Agreement is entered after discussion and in order to avoid the expense, uncertainty and distractions of litigation.  The Participating States and the Companies agreed to enter into this Agreement solely for the purpose of reaching a compromise settlement without the need for a hearing or further administrative action.

9.      This Agreement (or its Exhibits) may be amended by the Participating States and the Companies at any time.  All such amendments to this Agreement shall be in writing.

**D.    Remedies**

1.      Within fifteen (15) days of the Effective Date, the Companies shall pay the California Commissioner of Insurance a fine of $500,000, the Maine Superintendent of Insurance a fine of $175,000, and the Massachusetts Commissioner of Insurance a fine of $250,000.

2.      The Companies and the California Commissioner of Insurance have entered into a separate agreement to address the California-specific issues arising from the 2006 California Examination, the 2009 Stipulation and Waiver Agreement, and the 2010 California Re-Examination.

3.      If the Monitoring States determine after conducting the re-examination of the Companies, as described in paragraph C.2, above, that the Companies have not complied materially with the terms of this Agreement, they may assess a fine payable to the Participating States.  The Companies retain all rights under law, without limitation, to contest the basis for and assessment of any such fine.  Any fine imposed pursuant to this paragraph shall be allocated among the Participating States at their sole discretion.

4.      The Participating States retain the right to impose any regulatory penalty otherwise available by law, including fines, with respect to the Companies' willful violation of the terms of this Agreement or other violations of the law.  The Companies retain all rights under law, without limitation, to contest the basis for an assessment of any such regulatory penalties and fines.

9

LIFE INSURANCE COMPANY OF NORTH
AMERICA

BY: _____

ITS: President

DATED: March 14, 2013

CONNECTICUT GENERAL LIFE
INSURANCE COMPANY

BY: _____

ITS: President

DATED: March 14, 2013

CIGNA HEALTH AND LIFE INSURANCE
COMPANY

BY: _____

ITS: President

DATED: March 14, 2013

CALIFORNIA DEPARTMENT OF
INSURANCE

BY: _____

ITS: Insurance Commissioner

DATED: May 13, 2013

CONNECTICUT INSURANCE
DEPARTMENT

BY: _____

ITS: _____

DATED: _____

MASSACHUSETTS DIVISION OF
INSURANCE

BY: _____

ITS: _____

DATED: _____

MAINE BUREAU OF INSURANCE

BY: _____

ITS: _____

DATED: _____

PENNSYLVANIA INSURANCE
DEPARTMENT

BY: _____

ITS: _____

DATED: _____

10

LIFE INSURANCE COMPANY OF NORTH
AMERICA

BY: _Mark J Mendan_

ITS: _President_

DATED: _March 14, 2013_

CIGNA HEALTH AND LIFE INSURANCE
COMPANY

BY: _Mark J Mendan_

ITS: _President_

DATED: _March 14, 2013_

CONNECTICUT INSURANCE
DEPARTMENT

BY: _Thomas B Leonardi_

ITS: _Commissioner_

DATED: _5-10-13_

MAINE BUREAU OF INSURANCE

BY: _____

ITS: _____

DATED: _____

CONNECTICUT GENERAL LIFE
INSURANCE COMPANY

BY: _Mark J Mendan_

ITS: _President_

DATED: _March 14, 2013_

CALIFORNIA DEPARTMENT OF
INSURANCE

BY: _____

ITS: _____

DATED: _____

MASSACHUSETTS DIVISION OF
INSURANCE

BY: _____

ITS: _____

DATED: _____

PENNSYLVANIA INSURANCE
DEPARTMENT

BY: _Michael Consedine_

ITS: _Commissioner_

DATED: _3-15-13_

LIFE INSURANCE COMPANY OF NORTH AMERICA

BY: *Matt J Manun* (signature)

ITS: President

DATED: March 14, 2013

CONNECTICUT GENERAL LIFE INSURANCE COMPANY

BY: *Matt J Manun* (signature)

ITS: President

DATED: March 14, 2013

CIGNA HEALTH AND LIFE INSURANCE COMPANY

BY: *Matt J Manun* (signature)

ITS: President

DATED: March 14, 2013

CALIFORNIA DEPARTMENT OF INSURANCE

BY: _____

ITS: _____

DATED: _____

CONNECTICUT INSURANCE DEPARTMENT

BY: _____

ITS: _____

DATED: _____

MASSACHUSETTS DIVISION OF INSURANCE

BY: *Joseph G. Murphy* (signature)

ITS: Commissioner

DATED: May 8, 2013

MAINE BUREAU OF INSURANCE

BY: _____

ITS: _____

DATED: _____

PENNSYLVANIA INSURANCE DEPARTMENT

BY: *Michael Consedine* (signature)

ITS: Commissioner

DATED: 3-15-13

10

LIFE INSURANCE COMPANY OF NORTH
AMERICA

BY: _Matt J Muller_

ITS: _President_

DATED: _March 14, 2013_

CONNECTICUT GENERAL LIFE
INSURANCE COMPANY

BY: _Matt J Muller_

ITS: _President_

DATED: _March 14, 2013_

CIGNA HEALTH AND LIFE INSURANCE
COMPANY

BY: _Matt J Muller_

ITS: _President_

DATED: _March 14, 2013_

CALIFORNIA DEPARTMENT OF
INSURANCE

BY: _____

ITS: _____

DATED: _____

CONNECTICUT INSURANCE
DEPARTMENT

BY: _____

ITS: _____

DATED: _____

MASSACHUSETTS DIVISION OF
INSURANCE

BY: _____

ITS: _____

DATED: _____

MAINE BUREAU OF INSURANCE

BY: _Eric Cioppa_

ITS: _Superintendent_

DATED: _5/8/13_

PENNSYLVANIA INSURANCE
DEPARTMENT

BY: _Michael Consedine_

ITS: _Commissioner_

DATED: _3-15-13_

10

LIFE INSURANCE COMPANY OF NORTH
AMERICA

BY: _M̲_̲_̲_̲_̲_̲_̲_̲_̲_̲_̲_̲_

ITS: _President_____

DATED: _March 14, 2013_____

CONNECTICUT GENERAL LIFE
INSURANCE COMPANY

BY: _____

ITS: _President_____

DATED: _March 14, 2013_____

CIGNA HEALTH AND LIFE INSURANCE
COMPANY

BY: _____

ITS: _President_____

DATED: _March 14, 2013_____

CALIFORNIA DEPARTMENT OF
INSURANCE

BY: _____

ITS: _____

DATED: _____

CONNECTICUT INSURANCE
DEPARTMENT

BY: _____

ITS: _____

DATED: _____

MASSACHUSETTS DIVISION OF
INSURANCE

BY: _____

ITS: _____

DATED: _____

MAINE BUREAU OF INSURANCE

BY: _____

ITS: _____

DATED: _____

PENNSYLVANIA INSURANCE
DEPARTMENT

BY: _Michael Consedine_____

ITS: _Commissioner_____

DATED: _3-15-13_____

10

## Exhibit A

### PARTICIPATING STATE ADOPTION
### of
### REGULATORY SETTLEMENT AGREEMENT

### <u>TARGETED MARKET CONDUCT EXAMINATIONS OF</u>
### <u>DISABILITY INCOME INSURANCE CLAIM HANDLING PRACTICES</u>

IN THE MATTER OF

Life Insurance Company of North America, Connecticut General
Life Insurance Company, and CIGNA Health and Life Insurance
Company (f/k/a Alta Health and Life Insurance Company)

Philadelphia, Pennsylvania
NAIC # 65498, 63308

Bloomfield, Connecticut
NAIC # 67369

On behalf of [STATE INSURANCE REGULATORY AGENCY], I, [EXECUTING OFFICIAL], as [EXECUTING OFFICIAL'S TITLE], hereby adopt, agree, and approve the Regulatory Settlement Agreement dated [EFFECTIVE DATE] by and between the above-named Companies and the regulatory agencies named therein.

[STATE INSURANCE REGULATORY
AGENCY]

By:_____

Title:_____

Date:_____

## Exhibit B

## Social Security Awards and Disability Determinations

<u>Introduction</u>

A Social Security Disability Income ("SSDI") award by the Social Security Administration ("SSA") will be given significant weight in a claimant's favor under certain circumstances in making a Disability analysis. For that reason, where a claimant has been awarded SSDI benefits, the Claim Manager should review the SSA records related to the award and highlight the consideration given to the SSDI award and decision in the claim file documentation.  The Company will make a reasonable effort, consistent with all applicable SSA regulations, manuals, and guidelines, to obtain SSA records with the cooperation of the claimant, his/her legal representative, provider and/or the SSA, but will not delay its consideration of a claim should SSA records, despite the Company's reasonable effort, be unavailable for review in a timely manner.

This release provides direction on how SSDI-related information should be gathered and considered during the course of your claim evaluation, as well as how that information and consideration should be documented to the claim file.

<u>Procedure</u>

Affording significant weight to a SSDI award means that the SSA records related to the SSDI award are reviewed and consideration of the SSA's judgment that a claimant is disabled for SSDI purposes will generally be an essential element of the Disability evaluation under the governing Disability contract. There will be exceptions in some circumstances, however, where the SSDI award should not be given significant weight and may be less relevant, or of no relevance, to our liability determination. For example, the SSDI award may not be an essential element of the Disability evaluation where compelling evidence exists that, e.g.:

- The award is based on the SSA's use or application of internal administrative standards that may reduce the standard of proof required for certain claimants, e.g. transferability of skills for older claimants, and are inconsistent with the applicable Disability policy's proof requirements for Disability;

- The SSDI award is aged and/or inconsistent with other information relevant to the Disability determination, including, e.g. more current medical information and/or vocational and financial/earnings information;

- Where contractual provisions may preclude a claimant from receiving benefits regardless of Disability status, e.g. pre-existing conditions, contractual limitations, or a claimant's earnings have exceeded the maximum allowed under the policy;

- Where records relevant to the timing and/or basis of the SSDI determination are not otherwise available and the claimant has refused to provide and/or timely respond to the Company's reasonable requests for authorization to obtain the SSDI file.

In addition to these specified exceptions, there may be additional circumstances in which other evidence may clearly show that a claimant is not disabled as defined in the policy. An example of such evidence would be a situation where a claimant indicates that s/he cannot work and is not working, but the claim evaluation reveals that s/he is, in fact, working in an occupation and/or performing duties or activities that are inconsistent with his/her stated restrictions and limitations.

In those circumstances where a Claim Manager determines that a SSDI award is of lesser or no relevance, the Claim Manager should document the rationale(s) for that determination in the claim file. Specifically, upon reaching such a determination, the Claim Manager should:

- Document the specific information or circumstances supporting the determination that the award is of lesser or no relevance in the claim file;

- Clearly explain to the claimant in writing the basis(es) for the determination that the award is of lesser or no relevance. That explanation should include the specific information, circumstances and/or policy language relevant to the determination and its relation to the Disability liability decision.

Compelling Evidence: SSDI in Relation to the Disability Claim Decision

Although the SSA's disability definition uses similar terminology to the standard Any Occupation definition in our policies, it is not identical. Claim Managers must review the SSA records related to any award determination where SSA records are obtainable with reasonable effort and must always apply the Disability definition from the governing policy when making a decision on a claim.

Compelling Evidence - Determining Relevance Based on Policy Language, Limitations or Exclusions or Where SSA Processes Differ from Policy Requirements

Where the Company's policy contains a different definition of Disability (e.g. Own Occ v. Any Occ) or a benefit limitation not found in SSDI coverages (e.g. the MIL language discussed below), the difference between the wording or application of the policy language in the SSA regulations and in the Company's policy provides compelling evidence that will limit or negate the relevance of the SSDI award.

For example, if the policy contains a 24-month Mental Illness Limitation (MIL) and the SSA award of disability benefits was based on a mental illness condition, the SSDI award will be of lesser or no relevance to an adverse claim determination that is based on the 24-month MIL provision. Similarly, if the Company's claim determination is based on the fact that the claimant is not eligible for coverage or that the Disabling condition was Pre-existing as defined by the policy, then the SSDI award will not be relevant.

Similarly, the Company and the SSA may differ in their consideration of age in certain circumstances when determining whether a person is Disabled. For example, in instances that involve the transferability of skills for older claimants, the SSA regulations permit and specify a more limited analysis than the Company's policies.

Additionally, the SSA takes a similar, reduced proof approach to certain diagnoses or conditions, awarding benefits based solely upon the existence of the diagnosis or condition and presuming disability. These types of awards are referred to as compassionate allowances or presumptive disabilities. Our policies do not permit such reduced standards of proof, and the Claim Manager should continue to evaluate a claimant's Disability under the policy's terms and requirements with the medical, vocational and financial proof of loss information available.

In addition to the consideration of age or presumptive disability, another difference between the SSA regulations governing disability determinations and the Company's policies is the consideration of part-time work capacity. The SSA generally will only consider the individual's ability to perform full-time (8 hours/day) work, while the Company's policies typically require an analysis of the claimant's ability to perform part-time work in determining when benefits are payable.

Compelling Evidence - Determining Relevance When There is Inconsistent Medical Information or When There is Other Reason to Conclude that the Claimant is Not Disabled

Medical information and what it tells us about a claimant's level of functionality at the relevant time period(s) are critically important to the Disability analysis. Where an SSDI award provides relevant insight into the claimant's functional ability, it can be highly relevant to the Disability analysis. Where the medical information upon which the award is based is aged, e.g. 6 months or older, and/or provides no useful information or insight into the claimant's level of function, it will be less relevant.

In determining the relevance and impact of a SSDI award to the Disability evaluation, the Claim Manager should consider and address, as applicable, the following factors, as applicable in determining whether the SSDI award provides compelling evidence of Disability:

- A significant difference between the information reviewed by the SSA and the Company.

- A faulty, mistaken or inappropriate analysis of the available evidence by either the SSA or the medical resource relied on by the SSA in making its decision.

- The claimant's condition has changed or improved.

- The claimant's age, education and economic status.

- Whether occupations are identified within the claimant's restrictions and limitations that are appropriate based upon his or her training, education and experience.

- Agreement with the Attending Physician (Has the Attending Physician changed his/her opinion? Based on what information?).

- The amount of time since the award decision or the generation of the medical information supporting it.

- Whether SSA has reassessed the claimant's condition since its initial award decision. If so, when and what were the results of that reassessment?

The existence of any one or more of these factors is not an indication that the claimant no longer meets the policy's requirements for Disability, but may impact the Claim Manager's determination regarding the relevance of the SSDI award. Where these types of factors exist, a Claim Manager may reasonably determine that the SSDI award's relationship to the Disability determination is less compelling. As a SSDI award is generally an essential element of the Disability analysis, the Claim Manager should analyze and address these factors within the context of considering the claim file as a whole, reaching out to the claimant, his/her representative(s) and treating providers as needed to validate the information obtained, and carefully document conclusions in the claim file prior to making the claim determination.

An inability to obtain the file does not change the weight to be given to an SSDI award, unless the claimant who has been awarded SSDI benefits affirmatively indicates that s/he will not authorize the Company to obtain the SSA file and/or fails to timely respond to the Company's request for such authorization, in which case the Company will not afford significant weight to the SSA award. The file documentation should fully record the Claim Manager's efforts to obtain the SSDI file.

Validation of Information - Confirming We Have Current Medical Information

The claimant's medical record and ALJ award letter can contain information helpful in determining the reasoning behind the decision to award benefits. For claimants who have chosen SSDI representation from our offered expert vendors, the information our vendors initially submit to the SSA is provided by CGI and will mirror the information in our claim file. If the

vendor appeals the SSDI application to the ALJ/Hearing Level, the vendor may seek additional medical information from providers that is independent of the information the vendor initially received from CGI. Our SSDI assistance vendors will provide regular reports that indicate if new medical information has been gathered or generated during the SSDI appeal process, which may be independent of CGI's records.

If SSDI has been awarded, to validate that we have up-to-date medical and SSDI information, the Claim Manager should check the vendor reports during the course of gathering information and compare the recency of the vendor information to the medical in the claim file. If the Claim Manager determines there is more current information, s/he should attempt to obtain the current medical information and evaluate it accordingly, by:

1.   Contacting the vendor to obtain the information or identify the treatment providers who hold the information.

2.   Contacting the claimant (or claimant's representative) to confirm what, if any, additional medical records or provider information the SSDI file may contain. This step will apply where the claimant either is not represented in the SSDI application process or retained his/her own representative.

3.   Reaching out to treating providers to ensure we have all of the available medical information, and any assigned restrictions and limitations.

4.   If treatment providers do not timely respond to our requests, request authority from the claimant or his/her representative to obtain the SSDI file.

5.   If new medical information is received, proceed with complete medical review.

6.   Document the assessment of the new records and their relation to the claim determination in the context of the review of the claim file as a whole.

## SUMMARY

Disability evaluations are based on conclusions drawn from multiple factors including medical, vocational, and financial documentation applied to the provisions of the governing policy. An SSDI award and the information related to it should be an element of this analysis. Various factors will determine the relevance and impact of a SSDI award to the liability determination. The Claim Manager should analyze and address these factors within the context of considering the claim file as a whole, and document the file accordingly.

## Exhibit C

# Gathering Medical Information & Documenting Conclusions

**Table of Contents**

1. Introduction
2. Gathering Medical Documentation
3. Triggers for Gathering Additional Information
4. Reviewing Medical Information
5. Evaluating Medical Support of Disability
6. Evaluating Claims with Co-Morbid or Co-Existing Conditions
7. Summary

### Introduction

Standard definition of disability wording requires that disability arise from illness, sickness, or injury. Given this, documenting and confirming a claimant's medical status is an important component of disability determinations.

Documenting and confirming medical status involves forming an understanding of functional capacity, expected resolution of the disabling condition, and feasibility of return to work. To facilitate this process, this release provides guidelines for the following:

- Gathering relevant credible medical information
- Utilizing available resources to clarify restrictions and limitations
- Attempting to resolve discrepancies in medical statements or conclusions
- Outlining and documenting the medical conclusions on which a disability determination may be based
- Evaluating functional capacity with the presence of co-morbid or co-existing conditions

As stated above, this release focuses on the medical component of a disability evaluation. It does not contemplate issues of eligibility or exclusion, which may otherwise impact a claim evaluation.

**Gathering Medical Documentation**

Medical documentation can assist with claim management by providing a better understanding of functional capacity, expected resolution of a condition, and feasibility of return to work. Relevant medical documentation can be drawn from many sources including, but not limited to, the following:

- Medical records supplied by those providing treatment to the claimant; i.e. - office notes, treatment records and plans, clinical findings, medical tests including raw scores, pharmacy records
- Medical texts, articles, and other publications that are considered to be generally acceptable sources of medical information

Along with these most commonly utilized sources, additional information that may assist includes but is not limited to:

- The claimant's own statements,  including information gathered during phone calls or personal interviews
- Observations of the claimant's activities (personal interviews, surveillance, IME or FCE observations)
- Financial records
- Data from administrative/regulatory agencies for the purpose of determining the status of licensing and/or certification

**Triggers for Gathering Additional Information**

**Vague Statements**

Vague statements of impairment made by the treating or certifying physician generally do not provide enough detail to make determinations about the nature or degree of functional impairment resulting from a claimant's condition(s).  Examples include:

- "Claimant is totally disabled"
- "Claimant is temporarily totally disabled"
- "Claimant unable to do any activity"
- "Claimant cannot work"
- "Claimant off work until MM/DD/YYYY"

These types of general preclusion statements do not explain how or why the claimed impairment limits the claimant from performing his/her occupation.  Statements made without clarification or specific comment to restrictions and limitations may trigger additional questions and it is appropriate to seek further clarification from the treatment provider making the vague

statements.

**Co-Morbid or Co-Existing Conditions**

Co-morbid or co-existing conditions can impact the overall functional capacity of an individual and should be evaluated for their combined effect on the claimant.

Claim Managers should seek further clarification from treatment providers when they identify additional conditions or symptoms for which the claimant is or has been treated - or has reported - whether or not the claimant or provider is asserting Disability based on these conditions.

**Appropriate Care**

Standard language in our group disability contracts require a claimant "be under the Appropriate Care of a Physician," with Appropriate Care and Physician both further defined.  As medical information is gathered and reviewed, consideration of this provision may include noting the following:

- Specialty of the treating physician
- Length of time treating with and/or frequency of treatment
- Nature of the treatment being rendered or the treatment plan prescribed by the treating physician
- Correlation of nature and level of treatment to nature and level of impairment assigned/claimed
- Potential familial relationship between the claimant and treating physician
- Third party statements (employment records, etc.)

**Reviewing Medical Information**

Once all requested information has been gathered, review by appropriate resources occurs.  Above and beyond members of the Core Teams, this review can be accomplished either by internal or external medical resources.  Reviews of medical information may result in claims discussions, written documentation of conclusions, and possibly even further recommendations or suggested next steps.   When our opinion of a claimant's functionality differs with the treatment provider's conclusion of the claimant's functionality, limitations and abilities, contact with the treatment providers and/or utilization of external medical resources may be appropriate in an attempt to clarify functional discrepancies.

**Internal Medical Resources**

Each FCO is staffed with medical resources who are available to review and provide analysis of medical information contained in a claim file. These medical resources may:

- Offer advice on the completeness of medical records on file and recommend what, if any, additional information is needed to clarify a claimant's medical status
- Assess medical information and assure it is pertinent to the claim
- Contact treatment providers in an attempt to clarify information supplied
- Assist in drafting narratives or questions for an IME, FCE, Peer Review, or communications with treating physicians
- Apply medical expertise relative to diagnosis, level of impairment, and expected recovery
- Evaluate restrictions and limitations in relation to the reported disabling condition

Releases "STD CM/NCM Medical Management Process" and "LTD CM/NCM Medical Management Process" provide additional detailed information on the workflow and referral processes for utilizing internal medical resources. The need for and use of internal medical resources may vary from claim to claim and will occur where the Claim Manager deems necessary, based on the facts of the file.

**External Medical Resources**

Various external medical resources are also available to review and provide analysis of medical information contained in a claim file. The need for and use of external medical resources may vary from claim to claim and will occur where the Claim Manager deems necessary, based on the facts of the file. Generally, these resources can be helpful in clarifying discrepancies in medical information or opinions and in identifying current functional status and level of impairment. This type of clarification may be particularly useful where, e.g., treatment records do not provide sufficient detail to determine the level of impairment, a treatment provider assigns restrictions and limitations that do not correlate with the clinical findings and observations documented in his/her treatment notes, there is an inconsistency of information provided by different treatment providers, etc.

Where deemed necessary, an IME, FCE, Peer Review, or other form of external review/exam can be utilized to either obtain additional information or clarify existing information. The release "Guidelines for Use of External Medical Resources" provides additional information on when the use of external resources should be considered. Releases "IME Referral Process" and "FCE Referral Process" provide additional detailed information on the workflow and referral processes for utilizing external medical resources.

<u>**Evaluating Medical Support of Disability**</u>

**Non-Disputed Medical Conclusions:**

Upon review of medical documentation, our internal medical resources may concur with the conclusions and functional capacity stated by the treating physician.   What was reviewed, the agreed upon restrictions and limitations, expected duration, and any suggested ongoing follow-up for information will typically be documented in the claim file by the medical resource. Utilizing these conclusions, the Claim Manager will continue with the claim management process and evaluation of disability.

In the event we obtained a Peer Review, IME, and/or FCE, and the treating physician agrees with conclusions stated in these reports, the Claim Manager will also continue with the claim management process and evaluation of disability.

**Disputed Medical Conclusions:**

Upon review of medical documentation, our internal medical resources may disagree with the conclusions and functional capacity stated by the treating physician.   What was reviewed, restrictions and limitations the reviewer feels are supported, expected duration, and any suggested next steps will typically be documented in the claim file by the medical resource.

When our opinion of claimant's functionality differs with the treatment provider's conclusion of the claimant's functionality, limitations and abilities, contact with the treatment providers may be appropriate in an attempt to clarify functional discrepancies.  When these efforts do not resolve the questions of functional status and level and impairment, use of external resources may be appropriate in attempt to gain understanding of the claimant's functional capacity, or to provide additional documentation and rationale for the medical conclusions on which the evaluation of disability will be based.

Following a review of medical documentation and discussion with the treatment provider, there may be instances when agreement on functional capacity cannot be reached.  When this occurs, the internal and/or external medical resource provides a summary of available documentation and detailed rationale to support the medical conclusions on which the Claim Manager's evaluation of disability will be based.   If a disagreement regarding the extent of the claimant's functional capacity exists, the medical resource may consider the following in this summary:

- Cite findings from medical documentation in the claimant's own medical records or external examinations.  (see "medical documentation" above for additional information

v

on what this may consist of).

- Utilizing the cited findings and substantial evidence contained in the file, provide rationale for functional capacity.
- Provide detailed explanation why the treating physician's conclusions exceed the findings or why these findings are inconsistent with the substantial evidence contained in the claim file.

## Evaluating Claims with Co-Morbid or Co-Existing Conditions

### Whole Person Analysis

When evaluating a claim with co-morbid or co-existing conditions, Claim Managers should consider the impact of those conditions on the whole person and determine if the combined effect impacts the individual's ability to function in an occupational setting.  Specifically, Claim Managers should review all data available including claimants' reports of symptoms as well as physical findings.

All conditions that are relevant to the claimant's ability to function, including their combined effect on the whole person, should be considered.

Claim Managers and Expert Resources should consider and afford appropriate weight to all conditions whether or not the claimant or the claimant's physician is asserting disability on the basis of the specific condition.

When co-morbid or co-existing conditions exist, Claim Managers and Expert Resources share responsibility to ensure that all conditions are considered and afforded appropriate weight.  In addition, when multiple resources are used, opinions should be coordinated to present a coherent view of the claimant's medical condition(s), capacity, and restrictions and limitations.

### Co-Existing vs. Co-Morbid Conditions

- A claimant has co-existing conditions when s/he has multiple conditions, but all of the conditions may not impact his/her functionality.
- A claimant has co-morbid conditions when s/he has multiple conditions that independently impact his/her functionality.

In assessing and addressing each of these conditions within the context of their overall impact on the claimant's functionality, consideration should be given to the currency of each condition, e.g. conditions or symptoms the claimant experienced in the past may not impact

current functionality.

The following information should be evaluated and documented in the Medical Analysis Checklist as it pertains to the claimant's functional capacity:

- Each condition should be identified along with any stated or identified restrictions and limitations
- The combined effect of the diagnoses and impairments should be assessed for their impact on the whole person
- Any additional information that explains the rationale of any conclusions reached.

<u>Summary</u>

Reviewing a claimant's medical status and confirming functional capacity are main components of determining disability.   Medical information can be gathered from a variety of sources and our medical staff should be utilized, as needed, when reviewing the information on file, drawing medical conclusions, and proposing next steps.

Medical conclusions assist a Claim Manager by providing a basis for functional capacity, expected resolution of the disabling condition, and feasibility of return to work.

The claim evaluation and determination of disability are the responsibility of the Claim Manager.  Claim determinations are based on conclusions drawn from multiple factors including medical, occupational, and financial documentation applied to the policy provisions at hand.

## Exhibit D

### Guidelines for Use of External Medical Resources

A.   *Treating Provider Related.*  When medical information in the claim file lacks clarity or sufficiency to assess the claimant's medical condition, functional status and level of impairment or where the claims handler has reason to question the opinions or information provided by the claimant's treating provider, the appropriate internal medical resource should contact the treating provider either by phone or by letter for clarification or additional information.  If a telephone contact cannot be arranged, a letter outlining the question(s) and issues should be sent to the treating provider, which invites a reply either by phone or by letter.

Following outreach to treating providers, if the claimant's condition, functional status and level of impairment are still unclear or if the claims handler disagrees with the opinions or information provided by the treating provider, the use of external medical resources, such as a Peer Review, an independent medical evaluation ("IME"), or a functional capacity evaluation ("FCE") should be considered  under the following guidelines unless it is determined that the claimant's medical condition, functional status or level of impairment meets the policy's requirements.

1.   A Peer Review consists of an independent review and analysis of the claimant's medical records.  A Peer Review should be sought whenever the question primarily concerns an issue of data interpretation, and therefore an examination of the claimant would not be useful to understand the reported condition causing impairment.

2.   An IME or FCE is an examination of the claimant by a healthcare professional and is typically conducted at the request of the company.  These examinations can be used to supplement the claimant's medical record or provide greater detail as to the extent of the claimed impairment. An IME or FCE of the claimant should be considered when there are disputed or unclear medical conditions, functional status, or levels of impairment.  These guidelines are the controlling document but Release IME Referral Process and FCE Referral Process may be consulted to provide additional detailed information on the workflow and referral processes for utilizing external medical resources.

An IME or FCE of the claimant should be sought whenever there is lack of agreement and the opinion of the company's internal medical resource is the primary basis for denial or termination of benefits unless the following conditions are satisfied and well documented in the file:

a)   The Medical Director (a medical professional with the highest level credentials in the appropriate specialty relating to the reported condition regarding which there is disagreement or a lack of clarity) has reviewed the specific claim, focusing particularly on the area or areas of disagreement between the treating provider(s) and the reviewing internal medical resource;

b)   The  Medical Director reviewing the  file performs his or her own separate analysis of the issue or issues upon which there is disagreement, including any other information in the file deemed by the Medical Director to be relevant to the claim decision; and,

c) The Medical Director reviewing the file concludes that the position of the internal medical resources involved in the claim file and in disagreement with the treating provider is correct, after having determined that the treating provider's opinion is not well supported by medically acceptable clinical or laboratory diagnostic techniques and is inconsistent with the other substantial evidence in the claim file.

If the Medical Director reviewing the file is unable to reach the conclusions outlined in subparagraphs a) through c) above, then an IME/FCE should be performed.  If there is a lack of clarity or a disagreement regarding more than one reported condition, then an IME/FCE should be performed unless Medical Directors with the appropriate specialty relating to each of these conditions are able to reach and document these conclusions.

If the Medical Director agrees with the treating provider's opinion, there is agreement as to the current existence of a disabling condition and no IME/FCE is needed at the present time.

B.     *Other Circumstances.*  An IME/FCE (or in circumstances relating to an issue of data interpretation in which case a Peer Review) should be sought whenever any of the following occurs unless the decision is made to pay/or continue to pay the claim:

1.     A prior IME/FCE found disabling limitations and the current impairment is based on the same limitations;

2.     An internal medical resource or other company resource, e.g., legal, compliance, or benefit specialist responsible for the claim, states that an IME/FCE is needed;

3.     There is a difference of opinion between two or more internal medical resources with respect to the existence of a disabling condition; or

4.     The claimant or the treating provider requests an IME/FCE, either directly or through the claimant's representative.

C.     *Professional Criteria.*  A Peer Review, IME, or FCE must be obtained and conducted on the basis of objective, professional criteria:

1.     The company shall select individuals to conduct Peer Reviews, IMEs, and FCEs solely on the basis of objective, professional criteria, and without regard to results of previous reviews or examinations conducted by such individuals; and,

2.     Neither the company nor any of its officers or employees shall attempt to influence the impairment determinations of professionals conducting Peer Reviews, IMEs, and FCEs.

**Exhibit E**

**LINA Clinical, Vocational, and Medical Services**

**Statement Regarding Professional Conduct**

Dear Medical Professional:

LINA is committed to standards for the prompt, fair and reasonable evaluation and settlement of claims. As participants in the claims process we play an integral role in achieving these service standards:

*With a commitment to integrity, quality and superior service, we will*:

- Make appropriate decisions by providing a thorough, fair and objective evaluation of all claims.

- Pay all valid claims in a timely manner with a high level of service.

- Partner with our claimants in their efforts to return to work or to independent living.

These goals cannot be fully realized without our full commitment to our professional ethical standards. Likewise, LINA's commitment is that these standards not be compromised in the course of our work activities on its behalf. Ultimately, however, professional ethical conduct is an individual responsibility. The measure of our success is how we conduct ourselves each day.

Please review and retain the attached "LINA Clinical, Vocational, and Medical Resource Statement Regarding Professional Conduct." We are confident in your commitment to conduct yourselves in accordance with these high standards.

Sincerely,

[LINA Senior Officer]

**LINA Clinical, Vocational, and Medical Professionals'
Statement Regarding Professional Conduct**

Clinical, vocational, and medical professionals will:

➢    Comply with all applicable laws, ethical codes, and standards of professional conduct.

➢    Communicate promptly and professionally.

➢    Discuss medical and/or vocational facts in an open and honest manner.

➢    Provide fair and reasonable evaluations considering all available medical and/or vocational evidence, both objective and subjective, both supporting impairment and supporting capacity.

➢    Consider all diagnoses and impairments, and their effect on the whole person, when evaluating medical and/or vocational data in a claim file.

➢    Work with or refer files to other appropriate medical personnel when specialization prevents one professional from considering all impairments and diagnoses in an evaluation of the whole person.

➢    Represent medical and/or vocational facts accurately.

➢    Provide reasonable, clear, and accurate explanations of professional opinions so that clear and full explanations of decisions based on those opinions are available to the claimant.

➢    Avoid redundant or unnecessary requests for information, e.g. duplicate information, data not reasonably required for adequate analysis, or data not material to the analysis of the claim.

➢    Report any significant barriers to achieving these objectives to [designate senior official].

_____

I have read and understand the principles and guidelines above. I agree to abide by these principles in my work on behalf of LINA, and to consult with peers and managers if I am unclear regarding my responsibilities under these principles or encounter barriers to abiding by them. In addition, prior to making each determination as to a claimant's impairment, for which I have been trained, I will certify that I have reviewed all medical, clinical, vocational and other evidence provided to me bearing upon impairment.

_____          _____
Name                                                             Date

ii

## Exhibit F

### Remediation of Certain Denied Claims

The Companies will review certain claims made by residents of the Participating States and provide remediation as appropriate. The review will be in accordance with the enhanced claims procedures set forth in the Agreement and the criteria list below.

All LTD claims made by residents of Participating States that were denied by the Companies on, or adversely terminated by the Companies as of, a date during the Remediation Period (defined below) shall be subject to review and remediation if the claim was denied or adversely terminated for reasons other than: a) application of other policy provisions that are not related to medical condition(s) (e.g. coverage eligibility, exclusions, and limitations); b) withdrawal of the claim; c) death of the claimant; d) not having satisfied the elimination period; d) maximum benefit had been paid; or, e) claimant returned to work or if the claimant initiated litigation and has not withdrawn such litigation (either independently or in favor of participation in the Remediation Program). Additionally, claims where a state insurance department has notified the Companies that it has accepted a fraud referral shall be excluded from the review and remediation.

The Remediation Period ("Remediation Period") for the residents of all Participating States (except California) shall run from January 1, 2009 through December 31, 2010. The Remediation Period for residents of California shall run from January 1, 2008 through December 31, 2010.

Claims will be reviewed to determine if application of the enhanced claim procedures set forth in paragraph B.1 of the Agreement would impact the delivery of benefits due. If there would be an impact, any additional benefits will be paid. If there would not be an impact, no additional action would be taken, and if it is unclear or more information is necessary and relevant to determine if there would be an impact, the Company will pursue that additional information.

The Company is not required to analyze whether the procedures set forth in Exhibit B regarding SSDI awards would impact the delivery of benefits due where the Claimant's SSDI award date is more than one year prior to the Companies' claim determination date.

If, during the course of reviewing a claim, factors which indicate additional benefits are due are discovered, a corrected payment will be made.

When conducting this remediation, the Companies will adhere to all existing standards for request and response timing stated in:

- the Contract under which the claimant is covered,

- the Companies' existing compliance policies and procedures, and

- ERISA Regulations, if applicable.

Any remediation payment by the Companies will be subject to the following conditions:

1. Claimants accepting remediation agree to forgo litigation and release the Companies from any further liability regarding denial or termination of benefits during the Remediation Period; and,

2. Remediated claims shall not be the subject of any additional market conduct sanctions imposed by any of the Participating States.

F

Richard F
CIGNA Group Insurance
Disability Management Solutions
P.O. Box 709015
Dallas, TX 75370-9015

Phone: 972-863-5814
Fax: 860-731-3211

www.mycigna.com



**CIGNA Group Insurance**
Life · Accident · Disability

MR. MICHAEL WARSHAW
ZAGLER FUCHS, PC
P.O. BOX 489
RED BANK, NJ 07701

October 20, 2015

Name:                          LISA MARINO
Incident Number:               2487057
Plan/Policy Number:            FLK0980008
Plan/Policy Holder:            SAINT BARNABAS HEALTH CARE SYSTEM
Underwriting Company:          Life Insurance Company of North America

Dear Mr. Warshaw,

This letter is about the appeal for your client's Long Term Disability (LTD) benefits under the above mentioned Policy. We have separated this letter into subject headings for your ease of reference.

<u>What is the Outcome of the Appeal Review?</u>

After completing our review of your client's claim, we must uphold our previous decision to deny the claim for ongoing benefits.

<u>What Provisions of the Disability Policy Apply to the Decision on Your Client's Claim?</u>

According to the employer's Policy:

*Definition of Disability/Disabled*
*"The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:*
*1. unable to perform the material duties of his or her Regular Occupation; and*
*2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.*

*After Disability Benefits have been paid for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:*
*1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified for based on education, training, or experience, and*
*2. unable to earn 60% or more of his or her Indexed Earnings.*

*The Insurance Company will require proof of earnings and continued Disability."*

<u>What Information Was Reviewed?</u>

All of the evidence on file, which included the additional information that was submitted with the appeal of your client's claim, was taken into consideration prior to rendering a determination. The decision has been made without deference to

CIGNA Group Insurance is a registered service mark of CIGNA Intellectual Property, Inc., licensed for use by Insurance company subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York and Connecticut General Life Insurance Company. Products and services are provided by these Insurance company subsidiaries and not by CIGNA Corporation.

October 20, 2015
Page 2

any prior reviews. The decision was based on your client's claim for benefits using Policy language along with all the medical documents contained within and viewed as a whole.

Who Reviewed Your Client's Claim?

- Appeals Specialist
- Senior Appeals Specialist
- Independent Medical Doctor, Board Certified in Neurology

How Was the Appeal Decision Reached?

Current documentation shows that your client's date of disability was March 14, 2009, at which time she was employed with Saint Barnabas Health Care System as a Billing Coordinator. According to the Dictionary of Occupational Titles, your client's occupation requires the following activity demands:

- Sedentary: exerting up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

According to the medical records as reviewed by the independent doctor, your client had a primary diagnosis of multiple sclerosis with associated symptoms. Dr. Falco indicated throughout his office visit notes that the main complaints by your client were related to dizziness and vertigo. On June 3, 2015, Dr. Falco stated that your client had the ability to perform several activities on an occasional basis and that she could use her upper extremities frequently. During a peer-to-peer discussion with the independent medical reviewer, Dr. Falco stated that your client's primary symptoms were subjective balance problems related to a surgery that was completed in 2006. Dr. Falco also stated that there were no cognitive deficits, but that your client would be unable to use a computer for any length of time. On July 8, 2015, Dr. Gilson indicated that your client was permanently disabled.

The medical evidence on file indicates that your client subjectively reported problems with her functionality, but there are no medical records that validate the complaints. The records do not contain any physical or neurological examination findings that measure the degree/severity of any functional deficits. Although Dr. Falco states your client is unable to use a computer, there is no clinical evidence to validate this restriction. Although Dr. Gilson states that your client is permanently disabled, the provider does not indicate in the records why your client is permanently disabled, nor does he supply any clinical evidence that measures the deficits of your client. Based on the current information, no restrictions or limitations are medically supported for the time period of July 26, 2015 and forward to the present time due to the lack of clinical findings as stated above.

In the letter dated June 29, 2015, it was stated that other occupations were identified through a Transferable Skills Analysis, which revealed that your client was capable of performing other occupations. This analysis took into consideration your client's work capacity, supported restrictions and limitations, education history, and employment history to determine if any occupations exist that she would be able to perform based on all of the current information in the file. Based on the information noted above, there is no evidence at this time to warrant an alteration to the decision to deny your client's claim. We are not disputing that your client may have limitations or restrictions, but an explanation of her functionality and how her functional capacity prevents her from performing any occupation from July 26, 2015 and forward is not medically supported.

During the review of your client's claim, the Life Insurance Company of North America considered the claim file as a whole for purposes of determining your client's entitlement to benefits. The documentation on file provided diagnoses, treatment notes, and other various medical record information that has been described in this letter. Disability is determined by medically supported functional limitations and restrictions which would preclude your client's ability to perform all the essential duties of any occupation from July 26, 2015 and forward to the present time. Thus, we are affirming our previous denial of your client's claim.

How Was Your Client's Social Security Award Considered in the Claim Decision?

October 20, 2015
Page 3

We are aware that your client has been awarded Social Security Disability Insurance (SSDI) benefits by the Social Security Administration (SSA), and have considered that fact in our claim review. The criteria used by the Social Security Administration (SSA) may differ from the requirements of the Policy under which your client is covered. You have reported to us that your client has not been contacted by the SSA for any recent testing. Based on this information, we have determined that there is no new information in the SSA file. Under the Employer's LTD Policy, consideration is given to your client's supported restrictions and limitations, along with her work experience, training and education.

Based on this consideration, we have determined that your client has transferable skills to other occupations.

<u>What if You Do Not Agree with the Appeal Decision?</u>

If you disagree with our determination and wish to have it reviewed, please follow the steps described below.

Based on the information provided by your client's employer, your claim is governed by the Employee Retirement Income Security Act of 1974, Public Law 93-406 (ERISA). A second appeal request is not required but will be accepted if you have different or additional information to submit. Here is how to submit a second appeal review:

- Submit your appeal letter to us within 180 days after the date you receive this letter.
- Your appeal letter should be sent to the Life Insurance Company of North America representative signing this letter to the address noted on the letterhead.
- Your appeal letter may include written comments as well as any new information you may have.
- You must also submit new additional medical information. Additional information may include, but is not limited to: medical records from your client's doctor and/or hospital, test result reports, therapy notes, etc. These medical records should cover the period from July 26, 2015 and forward.

You may also wish to have your client's doctor(s) provide new information such as:

- Copies of any other diagnostic test results which document the severity of your client's condition to the extent that she is unable to perform the duties of any occupation. Please include copies of test results performed from July 26, 2015 and forward.
- Specific restrictions and limitations that preclude your client from performing the duties of any occupation. Please include any specific essential job functions, activities of daily living, and social/recreational activities that she is incapable of performing.
- Any documentation of discussions by your client's treating providers of the medical evidence which is preventing her from performing the duties of any occupation. Please include any current data sources used to make these determinations.
- Any documentation of discussions by your client's treating providers describing her current and future treatment plan(s). Please include any problems associated with the treatment, as well as the treatment goals and strategies. Also, please include how the treatment plan addresses your client's returning to work.

Under normal circumstances, you will be notified of a decision on your client's appeal within 45 days of the date your request for review is received. If there are special circumstances requiring delay, you will be notified of the reason for delay within 30 days of receipt of your request, and every 30 days thereafter.

Your client has the right to bring a legal action for benefits under the Employee Retirement Income Security Act of 1974 (ERISA) section 502(a) following an adverse benefit determination on appeal. Your client and her plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local United States Department of Labor Office or your State Insurance Regulatory Agency.

Please be aware that you are entitled to receive, upon request and free of charge, information relevant to your client's claim for benefits.

The employer's Policy contains the following provisions:

*Legal Actions*
*"No action at law or in equity may be brought to recover benefits under the Policy less than 60 days after written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, has been furnished as*

October 20, 2015
Page 4

*required by the Policy. No such action shall be brought more than 3 years after the time satisfactory proof of loss is required to be furnished."*

*Time Limitations*
*"If any time limit stated in the Policy for giving notice of claim or proof of loss, or for bringing any action at law or in equity, is less than that permitted by the law of the state in which the Employee lives when the Policy is issued, then the time limit provided in the Policy is extended to agree with the minimum permitted by the law of that state."*

Nothing contained in this letter should be construed as a waiver of any rights or defenses under the Policy. This determination has been made in good faith and without prejudice under the terms and conditions of the Policy, whether or not specifically mentioned herein.

Please contact our office at 972-863-5814 should you have any questions.

Sincerely,

*Richard J*

Richard F
Appeal Claim Manager

G

# *Neurology Specialists of Monmouth County, NJ*



Martin N. Herman, M.D.
Chris. P. Anayiotos, M.D.
Paul Gennaro, M.D.
Noah R. Gilson, M.D.
F. Bernard Ponce, M.D.
Neil R. Holland, M.D.

*Diplomates, American Board of Psychiatry and Neurology in NEUROLOGY*

107 Monmouth Road
West Long Branch, NJ 07764
732-935-1850

Fax: 732-544-0494

www.neurologyspecialists.org

## FOLLOWUP NOTE:

2010-05-07 Lisa Marino

Since the last visit on January 6, the patient continues to complain of fatigue, chronic dizziness and headaches. All of this followed removal of an acoustic aroma in September of 2006. On several occasions she attempted to go back to work but was unable to do so because of the visually and auditorily busy environment which then resulted in oculovestibular disturbances and feelings of dizziness. She says she has an unsteady gait. She's been unable to drive more than short distances because it results in a lot of dizziness and feeling poorly. The last time she was here a documented orthostatic hypotension.

PAST MEDICAL HISTORY: Migraine headaches and hypothyroidism. Removal of the acoustic neuroma as mentioned above.

MEDICATIONS: Synthroid. ,Treximet prn ha,
Motrin 600 mg prn ha

ALLERGIES: none

SOCIAL HISTORY :  The patient is currently on disability. She had worked as a billing manager for a doctor's office. She has no history of drinking or smoking.

FAMILY HISTORY : Negative for vestibular problems or brain tumor.

GENERAL REVIEW OF SYSTEMS : The 14 system review of systems was reviewed with the patient. These include the following categories: Constitutional symptoms, eyes, ENT, cardiovascular, respiratory, gastrointestinal, genitourinary, musculoskeletal, integumentary, neurologic, psychiatric, endocrine, hematologic lymphatic, allergic immunologic. Specific questions in each of these categories were responded by the patient with the answer "no". With the exception of the following: Chronic fatigue headaches, hearing loss with tinnitus it can be quite incapacitating, memory loss nervousness and some confusion, dizziness.

EXAMINATION : Hallpike maneuver resulted in the patient feeling unsteady and dizzy with no nystagmus.

2010-05-07 Lisa Marino
Noah Gilson, MD
Page 2

CONSTITUTIONAL:
- **Vital signs** B/P 100/60, heart rate 60,
- **general appearance**: well groomed. Uncomfortable.
- **neck range of motion and muscle tone and palpation**: Considerable spasm present in the cervical paraspinal muscles with decreased range of motion.

CARDIOVASCULAR:
- **Cardiac auscultation**: Cor. S1, S2. No murmurs.
- **Carotids:** 2+ without bruits.
- **Lungs:** were clear.
- **Peripheral vascular observation and palpation**: There was no peripheral cyanosis, clubbing or edema.

EYES:
- **Funduscopic examination**: Sharp disc margins with normal color and no pallor, no retinal hemorrhages or exudates. No AV nicking.

MENTAL STATUS :
- **Orientation**: Oriented to place person and time
- **Recent and remote memory**: intact
- **Attention and concentration**: The patient was awake mentally sharp and fully attentive.
- **Language and speech**: Speech is fluent, not dysarthric, not aphasic.

CRANIAL NERVES :
- **II**: Visual fields were full. Visual acuity was normal bilaterally, intact light reflex bilaterally Pupils were equal, round and reactive to light and accommodation.
- **III: IV, VI**: Extraocular movements were full without nystagmus or INO.
- **V**: There was equal facial sensation.
- **VII**:  Normal facial symmetry and strength.
- **VIII**: Hearing was intact to high frequency tuning fork and rubbing together of the fingers on the right side absent on the left.
- **IX**: The patient had normal palatal movements. Uvula did not deviate. Intact gag reflex.
- **XI**: Shoulder shrug of normal strength bilaterally
- **XII**: Normal tongue movements

MUSCULOSKELETAL, MOTOR, SENSORY: MOTOR EXAM :

2010-05-07 Lisa Marino
Noah Gilson, MD
Page 3

- **MUSCLE STRENGTH TESTING**: Normal strength proximally and distally in the upper and lower extremities. No pronator drift or tremor.

- **MUSCLE TONE**: Normal in the upper and extremities without spasticity or rigidity or cogwheeling.

- **REFLEXES** :  2+ and symmetrical in the brachioradialis, biceps, triceps, patellar and ankle jerks. Plantar responses were flexor.

- **COORDINATION** : Some impairment on finger to nose, finger to finger, rapid alternating movements and heel-knee-shin.

- **GAIT**: was slow and unsteady. She had difficult rapid turning. Negative Romberg sign.

- **SENSORY EXAM**: normal for pin prick, light touch and temperature without a dermatomal or peripheral nerve distribution of loss. Vibratory sense was intact in the finger and toes to low threshold. Position sense intact in the fingers and toes.

IMPRESSION: This is a woman status post removal of a left acoustic neuroma with sacrificing the left vestibular cochlear nerve. This has resulted in permanent disability because of chronic vestibular symptoms which then resulted in chronic recurring headache.

RECOMMENDATION: She is to remain on permanent disability. I will manage the headaches as they come up. Followup will be in 6 months.
Level of medical decision was moderate taking into consideration the following factors:
- Illness with severe exacerbation: She's never really gotten better.
- Significant risk of morbidity: Significant. The patient has been in constant agony.
- Significant neurologic illness: Significant.
- Possibility of significant prolonged functional impairment: She's currently disabled.

**PROBLEM LIST:**
#1 chronic left vestibulopathy status post resection of a left acoustic neuroma
#2 chronic lightheadedness with presyncope in part secondary to vestibulopathy and in part secondary to orthostatic hypotension
#3 chronic recurring migraine headaches now active again.

2010-05-07 Lisa Marino
Noah Gilson, MD
Page 4


**NEUROLOGIC MEDICATIONS AT THE END OF THE VISIT:**
1. Treximet prn ha
2. Motrin 600 mg prn ha

Noah R. Gilson M.D.